**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**GERALD W. CORDER,**

     **Plaintiff,**

**v.**

**ANTERO RESOURCES CORPORATION,
a Delaware corporation,**

     **Defendant.**

**Civil Action No. 1:18-CV-30
Hon. Judge Irene M. Keeley**

c/w 1:18CV31, 1:18CV32,
1:18CV33, 1:18CV34, 1:18CV35,
1:18CV36, 1:18CV37, 1:18CV38,
1:18CV39, 1:18CV40 for purposes of
discovery and setting schedule

## <u>DECLARATION OF KRIS L. TERRY</u>

Pursuant to 28 U.S.C. § 1746, Kris L. Terry declares as follows:

1.     I am over the age of majority and competent to testify to the matters contained herein.  Unless otherwise specified, my testimony is based on personal knowledge.

2.     I am the principal of Kris Terry & Associates, Inc., a consulting firm in the oil and gas industry.  I have more than thirty years' experience in the oil and gas industry.

3.     I have been retained by the attorneys for Antero Resources Corporation ("Antero") to provide my opinion as an expert in the oil and gas industry concerning the customs and practices of the oil and gas industry, the usage of terms in the oil and gas industry and their particularized meaning, and how such customs and practices apply in the context of royalty calculation under the leases at issue.

4.     A true and correct copy of the Expert Report of Kris L. Terry dated March 13, 2020 ("Expert Report") is attached hereto as "Exhibit 1" and incorporated herein.

5.     A true and correct copy of my resume, including a list of recent testimony is attached as Exhibit A to my Expert Report and incorporated herein.

**EXHIBIT B**

6.      A true and correct copy of a list of documents that I had reviewed as of March 13, 2020, in order to conduct my study and analysis and to formulate my opinions is attached as Exhibit B to my Expert Report and incorporated herein.

7.      A true and correct copy of a summary that I prepared of the royalty clauses in each of Plaintiffs' leases in this action is attached as Exhibit C to my Expert Report and incorporated herein.

8.      A true and correct copy of a map that I requested Antero to produce based on its business records to depict the location of Plaintiffs' leased acreage and Antero's drilling units with associated wells is attached as Exhibit D to my Expert Report and incorporated herein.

9.      A true and correct copy of a map that I requested Antero to produce based on its business records to provide an example of Antero's wells with gas that is sometimes processed and sometimes unprocessed and the alternative marketing outlets in the field is attached as Exhibit E to my Expert Report and incorporated herein.

10.      A true and correct copy of a map that I requested Antero to produce based on its business records to provide an example of possible transportation paths and sales locations for in-basin sales of residue gas is attached as Exhibit F to my Expert Report and incorporated herein.

11.      A true and correct copy of a map that I requested Antero to produce based on its business records to provide an example of possible transportation paths and sales locations for out-of-basin sales of residue gas is attached as Exhibit G to my Expert Report and incorporated herein.

12.      An updated, true, and correct copy of my resume, including a list of more recent testimony, was produced on December 17, 2020, as Bates-stamped AGC-012766 to AGC-012769 and is incorporated herein.

13.     An updated, true, and correct copy of a list of documents that I had reviewed as of December 16, 2020, in order to further conduct my study and was produced as Bates-stamped AGC-012773 to AGC-012776 and is incorporated herein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January _11_, 2021.

Kris L. Terry

12147610

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

GERALD W. CORDER, et al.,         )

                             )

         Plaintiffs,           )

                             )

v.                            )

                             )

                             )

ANTERO RESOURCES CORPORATION,   )

a Delaware corporation,         )

                             )

         Defendant.          )

CIVIL ACTION NO. 1:18-CV-30
Hon. Judge Irene M. Keeley
c/w 1:18CV31, 1:18CV32,
1:18CV33, 1:18CV34, 1:18CV35,
1:18CV36, 1:18CV37, 1:18CV38,
1:18CV39, 1:18CV40 for purposes
of discovery and setting schedule

# EXPERT REPORT
## of
## KRIS L. TERRY

March 13, 2020

## Introduction

1.      I am the principal of Kris Terry & Associates, Inc., a consulting firm in the oil and gas industry.  I have more than thirty years' experience in the oil and gas industry.  I have experience analyzing leases and other documents pertaining to the interests of oil and gas properties.  I also have experience with marketing, processing, and transportation of natural gas.  In addition, I am familiar with the valuation and payment of royalty based on leases, amendments, modifications, and other agreements.  I also have extensive experience with regulatory issues pertaining to the sale of oil and gas.  I have been accepted by numerous courts as an expert on these issues. My resume, including a list of recent testimony, is attached as Exhibit A. I am being compensated for my services in this matter at the rate of $450.00 per hour.

## Expert Assignment

2.      I have been retained by the attorneys for Antero Resources Corporation ("Antero") to provide my opinion as an expert in the oil and gas industry concerning the customs and practices of the oil and gas industry, the usage of terms in the oil and gas industry and their particularized meaning, and how such customs and practices apply in the context of royalty calculation under the leases at issue. In doing so, I will also offer opinions on the industry contractual and property arrangements for leasing minerals, as well as the production, transportation, processing, and marketing of natural gas.  I will also address the claims made by Plaintiffs, as well as their expert's opinions.

## Investigatory Sources

3.      In order to conduct my study and analysis and to formulate my opinions in this case, I have reviewed and examined documents, records, and data that related to Antero's operations and production in West Virginia. I have reviewed leases, sales contracts, processing, gathering, and transportation contracts, invoices, plant accounting statements, check detail, as well as gas composition data, revenue payment detail, discovery responses, maps, and other documents. I have reviewed the depositions of Plaintiffs and other family members, as well as Antero's corporate representative, Alvyn Schopp.  In addition, I reviewed Plaintiffs' expert's report and deposition testimony. I have cited the principal sources that form the basis of my opinions.  I have also relied on my experience in negotiating gas sales, processing, and transportation contracts.  A list of documents reviewed is attached as Exhibit B.

CONFIDENTIAL

AGC-012657

## Overview of the Oil & Gas Industry in West Virginia

**Physical Flow**

4.      The wells in this area of West Virginia generally produce natural gas.  Some wells, however, produce gas (including casinghead gas) and a condensate-type oil.  After the oil and gas are produced to the surface, the stream is piped through a separator at the wellhead. The stream is then separated into oil, gas, and water.  The oil and water are run into separate tanks on or near the well pad. The separated gas is transported through a flow line (smaller diameter pipelines installed by the oil and gas company) to a meter located at the well pad.

5.      The wellhead measurement of volume is the first step in accounting for gas from each well connected to the same pipeline system.  The gas is measured in thousands of cubic feet (MCFs). This is also the location at which the chemical composition is determined.  These tests are referred to in the industry as a "Gas Analysis."[1]

6.      The Gas Analysis for each well is generally conducted twice a year.  The most recent test results are then applied in the accounting.  The Gas Analysis provides the heating content of each MCF of gas produced, referred to as the MMBTUs.  Gas is bought and sold on a MMBTU basis. For example, when the price of natural gas is reported in the Wall Street Journal, it is being reported on a MMBTU basis.  The Gas Analysis also gives the percentage of each entrained liquefiable hydrocarbon component expressed as "GPM" or gallons per thousand cubic feet.

7.      After the gas is measured and metered, it is received into natural gas pipelines.  Generally, the first receiving pipeline is a gathering pipeline.  Gathering pipelines can be thought of as a spider web pipeline system connecting multiple wells in a defined geographic area. The wellhead meters are receipt points into this gathering system.  Often, but not always, the gathered gas moves across a series of pipelines through a process of increasing pressures provided by compression.  The compression boosts the pressure, making it possible to transport greater volumes in less space. The gathering pipeline aggregates volumes of unprocessed gas for delivery either into a gas processing plant or to a larger, downstream gas pipeline system without processing.

8.      Gas processing plants manufacture natural gas liquids ("NGLs") by separating the entrained liquefiable hydrocarbons through temperature changes or absorption.  Once converted from their gaseous state to a liquid state, the mixture is referred to in the industry as "Y-Grade." The Y-Grade liquid stream is delivered at the tailgate (outlet) of the processing plant to a pipeline.[2]

_____

[1] *See, e.g.,* AGC-001101.
[2] If an NGL pipeline is not available, Y-Grade may be transported by truck.

3

CONFIDENTIAL

AGC-012658

It is then transported by pipeline to a fractionator. The fractionator manufactures the purity products such as ethane, propane, isobutane, normal butane, pentane, and others by separating the components of the Y-Grade. The remaining gaseous portion of the hydrocarbon stream left over after manufacturing the Y-Grade is principally methane. Methane is the natural gas that consumers use in their homes and businesses. Methane, referred to as "residue gas," is delivered at the processing plant tailgate and is transported away from the processing plant as described below.

**Sales of Gas and Natural Gas Liquids**

9.      Natural gas may be sold at many points pursuant to individually negotiated gas sales agreements. For example, it may be sold as native gas at the well as it is metered and in the condition in which it is delivered; it may also be sold at a central delivery point in the field; or it may be sold where the gathering system connects to a downstream pipeline.  Gas may also be sold as residue gas at the tailgate of a gas processing plant; it may be sold at physical interconnects between transporting pipelines; or it may be sold at the interconnect between a pipeline and utility company.  In most instances, transporting gas away from the well and selling it downstream results in an increased value.  Gas sales agreements provide for the price, which generally may be a negotiated fixed price, a reported index price, or a netback from a downstream sales price.

10.      NGLs may be sold at different locations depending upon the terms of parties' NGL sales contracts.  They may be sold at the tailgate of a gas processing plant as Y-Grade.  As described above, Y-Grade may also be transported to a fractionation facility where it is separated into individual components.  The separated purity products, such as ethane and propane, may be sold or stored for sale at a later date.  NGLs are typically sold based on a published index price for the component products determined at a market center, such as Mont Belvieu, Texas. The price is adjusted for the difference in value of the NGLs at the location at which the NGLs are sold and the location for the index price.

**Midstream**

11.      The midstream sector of the oil and gas industry grew out of the fundamental restructuring of the industry by the Federal Energy Regulatory Commission ("FERC").  Beginning in the late 1980s, the FERC embarked on a program to deregulate the purchase and sale of natural gas while retaining the regulation of the interstate pipeline companies. This had the effect of largely removing the interstate pipelines from the business of buying gas at the well, and no longer installing gathering, compression, and processing facilities in the producing fields.

12.      Deregulation, however, did not change the characteristics of natural gas or its physical flow. Pipelines still had to be constructed to receive gas from new natural gas wells, which became acutely necessary with the development of shale production, such as the Marcellus Shale.  The midstream sector encompasses the activities that move gas and other hydrocarbons from the wells

4

AGC-012659

to the downstream points.  It includes such things as gathering, compression, treating, dehydration, processing, storage, pipeline transportation, and fractionation.

## Plaintiffs' Claims and Leases

13.     Plaintiffs contend that Antero has underpaid royalties and further contend that Antero has a duty under each of the leases at issue to pay royalties on the sale of residue gas and NGLs at the point of sale to multiple downstream purchasers without the deduction of any post-production costs.

14.     Plaintiffs own interests in multiple leases, several of which have been amended by separate agreements or by the Confidential Settlement Agreement and Release of All Claims entered into by certain Plaintiffs and Antero in August 2015 (the "Settlement Agreement").[3]  It is my understanding that the Court entered an order dated March 25, 2019.  The Court held that the Settlement Agreement "releases all claims, including breach of contract claims, with respect to all of the properties identified on the MPL [Master Property List], which arose prior to the execution of the Agreement."  The Settlement Agreement pertained to all production months prior to September 2015.

15.     With the exception of the Oma Corder Lease dated October 3, 1985, each of the leases at issue pertain to lands located in Harrison County.  Ms. Corder's lease pertains to a 50-acre tract of land located in Doddridge County.[4]

16.     It is my understanding that Plaintiffs own interests in 9 wells completed on a pad located in Harrison County, West Virginia.  The gas from each well flows to a gas production unit, at which separation occurs.  Then the gas is piped to individual well meters located on a pad referred to by Antero as the "Corder East." On the downstream side of each meter, the gas is delivered to the first receiving pipeline.

## Antero's Interests

17.     Antero markets the natural gas produced from the 9 wells in a variety of ways depending upon the relative values of gas and NGLs from month to month.  In other words, in some months a portion of the gas produced from the wells flows into a gathering line and then a transmission

---

[3] It is my understanding that the three sisters, Garnet Cottrill, Janet Packard, and Marlyn Sigmon were not parties to the Settlement Agreement.
[4] The mineral interest associated with this 1985 Oma Corder Lease is not subject to the Settlement Agreement.

CONFIDENTIAL

AGC-012660

pipeline without being processed.  In other months, some or all of the gas has been processed to recover NGLs.  However, even when gas is delivered to the Sherwood Plant, it is possible for the plant to by-pass the gas, and not process it to recover NGLs.

## Plaintiffs' Leases Do Not Provide the Same Payment Methodology

18.    In my opinion, Plaintiffs' Leases do not provide for the same type of royalty calculation due to the disparate royalty provisions created by various lease modifications and the Settlement Agreement. Such instruments must be evaluated individually to determine the correct basis for royalty payments.  This is further complicated by the fact that certain Plaintiffs own interests under different types of leases in the same well.  For example, Ms. Garnet Cottrill owns interests in the Cleta Unit 1H well subject to four different types of leases.

19.    Antero provided to me Plaintiffs' leases for my review.  I prepared a summary of the royalty clauses in each of the leases.  The summary is set forth on the attached Exhibit C.

Lease Type C1

20.    Lease Type C1 (Plaintiffs' Exhibit 2F),[5] subtype A, pertains to the 48.69-acre tract.  The base lease was modified to add a Market Enhancement Clause ("MEC") set forth on the exhibit to the lease.  The MEC reads as follows:

> It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from the Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more the, the price received by Lessee.

21.    The "Supersede Clause" in the exhibit states that "All term[s] and provision[s] of this Exhibit A supersede and replace those in the body of the oil and gas lease, to which this is attached, whenever they conflict."   To understand Antero's obligation, it is necessary to read the entire

---

[5] These leases are attached to Plaintiffs' Second Amended Complaint.

6

AGC-012661

royalty clause of the original lease and to apply both the original language and the MEC, which is in part dependent upon the gas quality at various steps along the chain of transportation.

22.     Further, nothing in the MEC conflicts with the provision in the original lease that states: "For royalty calculation purposes, Lessee shall never be required to adjust the sales proceeds to account for the purchaser's revenues, receipts, costs or charges or other activities that occur beyond and past the point of sale."   To the extent Plaintiffs' expert is adding back monies to Antero's revenues attributable to those activities of the purchaser, particularly with respect to NGLs, it would be inconsistent with this portion of the royalty clause.

23.     Moreover, the MEC permits deductions from and after the point at which gas is in marketable form.  Marketable form in the industry is a quality issue.  Antero performs multiple post-production services or pays to have those services performed at no cost to the royalty owner for the purpose of placing the gas in marketable form.  For example, Antero pays for dehydration for which it does not deduct any costs in calculating royalty.  Consequently, Antero places the gas in marketable form before it is delivered to a pipeline or even the Sherwood Plant.  Based on the MEC, such gas would then be subject to the post-production costs downstream of the point at which the gas is in marketable form.

24.     The purpose of a MEC is to place the royalty owner in a position that it only shares in costs when the costs enhance the value of the gas, which is exactly Antero's accounting practice as described in more detail below.  It should also be noted that the MEC expressly states that in no event shall the lessor receive a price that is less than, or greater than, the price received by the lessee.  Plaintiffs' expert offered a damages methodology which will result in the Plaintiffs receiving a price greater than Antero.

Lease Type C2

25.     The Lease Type C2 (Plaintiffs' Exhibit 3A) 1979 lease executed by Mr. and Mrs. James Corder provides that royalties for gas will be paid based on the value at the well.[6]  However, for casinghead gas, the royalty will also be paid on the *net value at the factory* for products extracted at a processing plant. This is an individual well calculation that is dependent upon the hydrocarbon composition of the well.  Antero's practice is to calculate the net factory value individually based on the unique hydrocarbon composition of the gas from each well.[7]

---

[6] Plaintiffs' Exhibit 4A is identical to Lease Type C2. All Plaintiffs except Leroy Packard own interests in the 1979 leases.
[7] Mr. Al Schopp testified in his deposition that Antero determines the NGL allocation on a well by well basis. A. Schopp Depo. Tr., pp. 47-48.

7

CONFIDENTIAL

AGC-012662

26.     The value at the well is terminology generally understood in the industry to mean market value.  In the industry custom and practice, wellhead market prices would be determined by comparing the price Antero received to the prices obtained by other sellers of comparable gas in the same vicinity.  If such comparable sales are not available, then the wellhead market price could be determined by a netback calculation, starting with the downstream sale price and deducting the costs incurred to transport the gas downstream.  Plaintiffs' expert has not conducted such a study.[8]

Lease Type C3

27.     Mr. and Mrs. Corder were also parties to a 1981 lease, Type C3 (Plaintiffs' Exhibit 5A). This lease provides for royalties to be paid on the price received by the lessee from the sale of gas "produced, saved, and marketed."  It is my understanding of Plaintiffs' contentions that they are entitled to more than the price received by lessee for the sale of gas "produced, saved, and marketed."

Lease Type C4

28.     The 1979 Doran Lease, Type C4 (Plaintiffs' Exhibit 6A) states royalty will be based on the gross proceeds from a sale at the prevailing price for <u>native</u> gas sold at the well (with no mention of NGLs or residue gas).[9] "Prevailing price" in the industry generally means a predominant price[10] and would be ascertained by comparison to other wellhead prices in the area. Further, "native gas" in the industry means gas originally in place,[11] which is not the same as residue gas and NGLs, i.e., the separated hydrocarbon components at a plant tailgate.

Lease Type C5

29.     The 1985 Corder Lease mentioned above, Type C5 (Plaintiffs' Exhibit 9), provides that royalties will be paid on gas marketed and used off the premises (measured on the farm) on the value at the well and the net value at the factory of the gasoline and other gasoline products manufactured from casinghead gas.  This requires an individual well determination because the hydrocarbon composition of the wells vary.[12]

_____

[8] *See, e.g.,* D. Reineke Expert Report, pp. 4-5.
[9] Plaintiffs' Exhibit 7A is also a Type C4 lease.
[10] Williams & Meyers, Manual of Oil & Gas Terms, p. 876 (2018).
[11] Williams & Meyers, Manual of Oil & Gas Terms, p. 691 (2018).
[12] Lease Type C6 (Plaintiffs' Exhibit 8A) is listed on Exhibit C.  This is an old, flat rate lease.  My understanding is that it pertains to limited interests in certain wells.  Lease Type C7 is similar, but not identical to Lease Type C1 with the MEC.

CONFIDENTIAL

AGC-012663

30.     Each of the leases and the six units with the 9 associated wells are depicted on the map shown on Exhibit D.

31.     Plaintiffs' expert has been instructed to assume that irrespective of the express lease provisions and the Settlement Agreement, Antero's obligation to pay royalties to Plaintiffs should be based on the "gross value of residue gas or NGLs."[13]  In my opinion, this assumption cannot be supported when examining the actual leases and the Settlement Agreement.  My lease analysis indicates that the original leases, as well as some of the modified or amended leases, allow Antero to calculate royalties after certain deductions.  Moreover, Plaintiffs' expert did not review the Settlement Agreement or the Court's Order dated March 25, 2019.[14]  Therefore, he has not considered the implications of the Settlement Agreement on royalty payments to the Plaintiffs and did not account for it in his damages calculation.[15]

32.     Antero's practice is to have its land department review each lease to set up the division order.  The lease analyst codes each lease to set up the royalty accounting for that lease based on the individual lease terms.  Because there are differences in leases, the dissimilarities in royalty provisions have real world consequences.[16]  For example, a lease that permits processing costs to be deducted, but prohibits the deduction of severance taxes, would be coded accordingly.  Due in part to the fact to the Plaintiffs own interests in the same wells under different forms of lease, which have been coded differently, simply looking at the revenue pay history to find "deductions" will not permit anyone to determine whether the royalties have been paid properly under an individual lease.

33.     Another complicating factor not considered by Plaintiffs' expert is the impact on the Plaintiffs who were parties to the Settlement Agreement or own an interest in a lease subject to the Settlement Agreement.  For example, in the Settlement Agreement Antero agreed to pay royalties to Gerald Corder and Randall Corder under the 1981 Roger Corder Lease (the "Roger Corder Lease")[17] in the same manner Antero had paid Roger Corder under the Roger Corder Lease (the "Roger Methodology").[18]  In addition, though the royalty clauses in the 1981 and 1979 leases are

---

[13] Reineke Expert Rpt., p. 4.
[14] *See, e.g.*, Reineke Depo. Tr., p. 39.
[15] In addition, though Mr. Reineke relied on AGC-001057A for accounting information, he ignored the fact that Antero over-refunded monies to Plaintiffs and did not "credit" Antero with those amounts.
[16] *See, e.g.*, A. Schopp Depo. Tr., pp. 76-77.
[17] Type C3, Plaintiffs' Exhibit 5A.
[18] The Roger Methodology is colloquial and simply means that no PRC2 or TRN3 costs have been deducted from gross revenue. Antero applied the Roger Methodology to all settling parties under the 1981 Roger Corder Lease, the 1979 Gerald Corder Lease, and the 1979 Randall Corder Lease.  The settling parties include Randall M. Corder, Lorena B. Krafft, Cheryl L. Morris, Tracy F. Bridge, Gerald W. Corder, Angela M. Nicholson, Kevin P. McCall, and Brian M. McCall.

9

AGC-012664

different, Antero agreed to apply the "Roger Methodology" to the 1979 Gerald Corder Lease and the 1979 Randall Corder Lease for the settling parties.[19]  Consequently, to the extent Gerald Corder and Randall Corder have deductions shown on their checks since the date of the Settlement Agreement, those deductions are attributable to their interest in the newer MEC lease.

34.    Contrast the foregoing with the payments to the three sisters.  They were not parties to the Settlement Agreement.   However, for the periods before and after the Settlement Agreement Antero paid the three sisters for their share of production under the  Roger Corder Lease based on the "Roger Methodology." On the other hand, Antero paid the three sisters for their share of the production under the 1979 Gerald Corder Lease and the 1979 Randall Corder Lease in accordance with the lease royalty clauses, which means, for example, they have been paid net factory value under both 1979 Corder Leases.

35.    As described above, Plaintiffs' expert has ignored these various differences in accounting for each Plaintiffs' interests in a given well.

## Antero Markets Gas in a Variety of Ways Depending upon the Relative Value of Residue Gas and the Value of NGLs and the Available Marketing Outlets

36.    To begin, it is worth noting that Antero incurs all lease operating expenses for the gas produced from the leases at issue.  This can include the costs to install and operate lease level gas processing units ("GPUs") and all maintenance.  Antero also incurs costs to dehydrate gas that is not processed.  None of these costs are passed on to Plaintiffs.[20]   Antero also does not charge Plaintiffs with any costs attributable to gathering pipelines in the field.  It pays royalties on 100% of the wellhead MMBTUs—no fuel incurred by Antero for gathering or transportation reduces royalty.[21]

37.    The 9 wells at issue are located in the Greenbrier area, in which the BTU of the gas is such that the gas may be processed to recover NGLs or may be delivered to the pipeline without processing. These wells have alternative marketing outlets in the field, which is depicted on Exhibit E.  The BTU content of these wells may make processing unnecessary or unprofitable, or both.[22] Antero refers to this gas as "Processed/Unprocessed" gas. When the gas is not processed, none of

---

[19] Lease Type C2, Plaintiffs' Exhibit 3A.
[20] Antero pays the gatherer to dehydrate gas at the various compressor stations and does not deduct such costs in calculating royalties.
[21] A. Schopp Depo. Tr., pp. 126-127.
[22] The MarkWest Gas Processing Agreement provides that gas must have a BTU content greater than 1,050 or else be blended with gas from other wells in order to deliver gas with a BTU content of at least 1,050.

10

the Plaintiffs will be charged any processing costs.[23] When the gas is processed, Plaintiffs may or may not be charged processing costs depending upon their lease language and the Settlement Agreement.

38.     In months in which gas is not processed, Plaintiffs do not receive any NGL revenue and do not pay any costs for processing.  Antero also pays all costs of dehydration, compression, and gathering before delivering gas to the ETC Bobcat pipeline, which means it does <u>not</u> take deductions of such costs under any of the leases.

39.     In months in which the gas from the wells is delivered to the Sherwood Gas Processing Plant, MarkWest Liberty Midstream & Resources, L.L.C ("MarkWest") processes Antero's gas to extract the entrained liquefiable hydrocarbon components as Y-Grade NGLs.  The Y-Grade NGLs are transported by pipeline to MarkWest's fractionation plant in Houston, Pennsylvania.[24]  The fractionator separates the Y-Grade into purity products such as ethane, propane, isobutane, normal butane, pentane, and other natural gas liquids. Antero, or MarkWest on Antero's behalf, sells the purity products in arms-length transactions at multiple locations.

40.     Separately, MarkWest delivers the residue gas at the Sherwood Processing Plant tailgate. Antero sells the residue gas in two principal ways.  First, it sells large volumes of gas In-Basin. The possible transportation paths and sales locations for In-Basin Sales are depicted on Exhibit F in the "yellow foot." Antero pays substantial transportation fees to the transportation companies shown on this Exhibit F, but does not charge Plaintiffs any In-Basin transportation costs associated with such sales.

41.     Antero also sells some residue gas Out-of-Basin.  Beginning in late 2016, Antero has paid firm transportation fees to interstate pipeline companies to transport the residue gas to Out-of-Basin markets, such as Louisiana or Chicago.  Certain of these locations are shown on Exhibit G. These downstream transportation costs are coded as "TRN3." In months in which Antero has enhanced the value of gas sold downstream, it deducts TRN3 costs to calculate the netback price paid to Plaintiffs.[25] If Out-of-Basin sales do not enhance the value, Antero does not charge any TRN3 costs. I will describe this calculation in more detail beginning in Paragraph 52.

42.     Plaintiffs' contentions in their Second Amended Complaint depend on the assumption that Antero's gas is processed for the recovery of NGLs at all times.  That is demonstrably incorrect.

---

[23] When the gas is <u>not</u> delivered to the Sherwood Plant located in Doddridge County, it is delivered into the ETC Bobcat pipeline.  These sales are not impacted by processing costs at the Sherwood Plant.
[24] A. Schopp Depo. Tr., pp. 22-23 and p. 50.
[25] A. Schopp Depo. Tr., pp. 85-87.  TRN3, however, is not deducted for leases and Plaintiffs subject to the "Roger Methodology" as described above.

11

CONFIDENTIAL

AGC-012666

Further, it should be noted that Plaintiffs' expert, Mr. Reineke, has testified in multiple cases it is the lessee's duty under the implied covenant to market to place gas in "marketable condition" at the lessee's sole expense. He defines "marketable condition" as "pipeline quality" gas; i.e., gas that meets the quality specifications of an interstate pipeline.  He has testified that transportation costs downstream of a receipt point on the interstate pipeline may be deducted in calculating royalties. He apparently has abandoned that view.  In this case, he opines that Plaintiffs are to be paid royalties based on the gross proceeds at any location where the gas is sold, including gas transported out-of-state on an interstate pipeline.  "It is the position of the plaintiffs that its leases and amendments do not allow deductions of any kind before royalties are calculated and paid to plaintiffs."[26]   Antero has incurred all costs to deliver gas to the first transportation pipeline for both In-Basin and Out-of-Basin sales, including any fuel. Nevertheless, Mr. Reineke moves the goal post.  He cites no industry support or lease language for his new standard.  I disagree that any industry standard would require this result. In addition, in my experience, while there are leases in the industry that stipulate royalties are to be paid on the value at the point of sale, none of these leases refer to a point of sale.

43.     It is noteworthy that Antero only charges processing fees when (i) gas is processed; and (ii) the net factory value of such recovered NGLs exceeds the shrink value as described beginning in Paragraph 48 below.   In my opinion, Plaintiffs' contention that they are entitled to royalties on NGLs refined as purity products, even in months in which processing is not profitable to Antero, cannot be supported by any custom and practice in the industry.

## Antero's Practice of Determining the Value of Processed Natural Gas Is Done on a Well by Well, Month by Month Basis

44.     In my opinion, based on my review of the data and testimony, Antero's practice of paying royalties on the greater of (i) the full wellhead MMBTU multiplied by the WASP; or (ii) the net factory value of the NGLs, plus the residue gas value, which calculation is done on an individualized well by well basis each month, exceeds industry standards.

45.     The historical practice in the industry has been to determine royalty based on the value of gas at or near the well, before the gas is commingled in a pipeline with other gas, unless the lease expressly provides otherwise.  When gas is not sold at the well, but is sold downstream of the well, the industry often uses a netback method to value gas (price at some downstream delivery point

---

[26] Daniel T. Reineke Expert Report, p. 4.

CONFIDENTIAL

AGC-012667

less the costs to deliver it there).  While Antero calculates a netback price for its own revenue, it prepares a separate analysis before paying royalties.

46.     As noted, Antero contracted with MarkWest to process gas from certain wells and fractionate its NGLs.  With respect to the gas processed, the Sherwood Plant allocated to Antero its volumes of NGLs.  Antero or MarkWest on its behalf sold the NGLs as purity products.

47.     Conceptually, each month before Antero pays royalties it determines whether the revenue obtained from processing gas resulted in an improvement of the value of the gas.  It applies a methodology in paying royalties referred to as its "Upgrade Calculation." This calculation of the net value at the factory ("net factory value") involves comparing the value of the NGLs, after costs, to the value of the wellhead MMBTUs that were converted to NGLs in order to determine whether or not processing the gas and extracting the NGLs enhanced the value, i.e., resulted in a greater value than not processing.  To make this determination, Antero focuses its evaluation on the "shrink."

48.     "Shrink" or "Shrinkage" in the industry custom and practice means the hydrocarbon (volume) reduction of the gaseous stream that occurs when the entrained liquefiable hydrocarbons are converted from their gaseous state to liquid state.[27]  Antero's practice is to determine the unique hydrocarbon make-up of each well because each well yields a certain volume of NGLs.  These NGLs (in this case, the purity products) sell for a certain amount every month.  And, the NGLs have a certain BTU content.  Therefore, Antero determines the MMBTU of the shrinkage and multiplies it by Antero's WASP.[28]  If the value of the NGLs, minus the cost of processing, exceeds the value of the "shrink," Antero pays royalties on the NGLs and deducts the processing costs ("PRC2").  If the net factory value of the NGLs does not exceed the value of the "shrink," Antero instead pays royalties on the wellhead MMBTU of the gas multiplied by the WASP. The result is that the royalty owner is paid on the greater of net factory value or the shrink value on a well by well and month by month basis.[29]  I should emphasize that this calculation only occurs with respect to the months in which gas produced from the wells was processed.

49.     Because Antero prepares the "Upgrade" or enhancement comparison on a well by well basis each month,[30] the analysis for the wells in which Plaintiffs own an interest (assuming the gas from their wells was processed in a month) will not be the same for another well with a different

---

[27] Gas Processors Association Glossary Definition of Words and Terms Used in the Gas Processing Industry.
[28] Antero calculates its WASP by allocating the highest prices received to the largest volumes sold.  In addition, if Antero sells gas it has purchased from third parties at a price higher than the price it realized for its own gas, it substitutes these higher priced sales in the WASP for sales of gas at lower prices, thereby raising the WASP.
[29] A. Schopp Depo. Tr., pp.109-111.
[30] Antero's Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 2.

13

AGC-012668

chemical composition.  Plaintiffs may also not receive an allocation of NGLs or be charged any costs simply because the gas was not processed.

## Antero Only Charges Transportation for Gas That is Sold Out-of-Basin, Not In-Basin Sales, And Only When It Results in a Greater Value

50.     In my opinion, Antero's practice of charging transportation costs for Out-of-Basin sales that enhance the value of the In-Basin gas sale on a well by well basis meets or exceeds industry standards.

51.     The value of gas can be enhanced in multiple ways, including by transporting the gas downstream to receive a higher price. Ordinarily, in the oil and gas industry, as gas is transported to larger markets with greater demand, the price of gas increases.  Antero makes substantial efforts to find and sell to buyers willing to pay the highest price at downstream locations where it can deliver gas given any capacity constraints. To reach these customers, it must obtain and pay for firm transportation capacity. In the spring of 2017, Antero obtained by assignment a small volume of firm capacity on a newly completed section of the Rockies Express Pipeline ("REX") to be able to deliver gas to Chicago.  This provided Antero a new marketing outlet out of the basin.  Late in 2018, Antero obtained its own firm transportation on REX to Chicago.  Once Antero had obtained potential Out-of-Basin marketing outlets, it included the higher Out-of-Basin sales in the WASP.

52.     After Antero began making Out-of-Basin sales, it made the decision to compare its results to the index prices reported for In-Basin sales.  Each month Antero compares its WASP to the In-Basin index prices to determine if the Out-of-Basin sales result in an enhancement of value.  If the WASP exceeds the In-Basin index prices, Antero takes a TRN3 deduction up to the limit of the more favorable price in calculating the netback price paid to Plaintiffs.  If, on the other hand, the comparison to In-Basin index prices indicated that Antero could have received more money by selling at index, it excluded the transportation costs associated with the Out-of-Basin sales.[31]  This month to month comparison ensures that Plaintiffs have been paid royalty in an amount greater than market values, which is represented by the In-Basin index prices.

53.     In my experience, index prices for a given area are widely regarded as representing market value for gas delivered to a pipeline in the area.[32]  And, they are generally more than market value at the well because they are "delivered to pipeline" prices, not wellhead prices.  As a result, any

---

[31] Antero's Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 2.
[32] *See, e.g.*, Platts Methodology and Specifications Guide, North American Natural Gas, May 2019.

14

CONFIDENTIAL

AGC-012669

Plaintiff that received a TRN3 cost on his or her royalty statement can be assured that they received at least market value for the gas.[33]

## Conclusion

54.     In my opinion, the evaluation of whether Antero paid royalties properly can only be decided by comparing its obligation to its performance.  The determination of whether Antero paid royalties properly to the Plaintiffs necessitates applying the terms of the leases and the Settlement Agreement to the various sales arrangements in effect from time to time.  In addition, quantifying the market value of gas for the wells at issue cannot be gleaned from Antero's records, but would require a comparison of Antero's prices to the prices obtained for the sale of comparable gas quality and quantities in the vicinity.  Antero strives where possible to pay these Plaintiffs an enhanced value.

55.     Based on my experience, knowledge, education, skill, and training in the areas in which I am offering testimony, these opinions are offered with a reasonable degree of certainty.

---

[33] The calculation is even more favorable to Plaintiffs because Antero drops out its lowest price sale, attributing that sale solely to Antero's own volumes of gas and inserts any higher value volumes purchased from third parties.  A. Schopp Depo. Tr., p. 155.

15

CONFIDENTIAL

AGC-012670

To the extent additional information becomes available, I reserve the right to amend or supplement these opinions as appropriate.

Kris L. Terry

CONFIDENTIAL

AGC-012671

EXHIBIT A

**KRIS L. TERRY**
Kris Terry & Associates, Inc.
3232 Villanova
Dallas, Texas 75225
214 750-1775
kt@kristerry.com

## PROFESSIONAL EXPERIENCE

1989
To Present

*President*
Kris Terry & Associates, Inc.

Established an oil and natural gas consulting firm to provide clients the following services: evaluating, negotiating, and documenting stock and asset acquisitions; marketing gas directly to end users; securing firm and interruptible transportation in support of direct marketing efforts; and litigation support and settlement negotiations in contract disputes and regulatory proceedings.

Represented clients in federal and private royalty audits; conducted training in organizing gas control procedures and handling imbalance penalties; represented clients in interstate pipeline Order No. 636 restructuring proceedings; assisted clients in resolving gas imbalances and negotiating gas balancing agreements.

Consulted with clients on oil and gas accounting and royalty payment matters, including proceeds accounting and market value analysis; analyzed payment records, the sale of crude oil at the lease and at market centers, gas processing and the sale of liquids; and reviewed allocation and gas control issues.

1986 to 1989

*Manager of Regulatory Affairs and Litigation*
Fina Oil and Chemical Company

Developed, obtained management approval for, and implemented the company's strategic plans for decreasing its reliance on traditional pipeline purchasers for the disposition of company production by increasing its reliance on selling gas directly to purchasers in consuming regions. Responsibilities included terminating old business relationships and negotiating new ones in furtherance of those strategic plans and participating in more than 70 FERC rate and certificate proceedings that affected the new business relationships.

Organized the company's litigation response to reductions in purchases by pipelines under long-term contracts. Selected outside counsel and testifying and consulting experts to develop and pursue claims of $175 million against nine major interstate and intrastate pipelines. Developed and obtained management approval of strategy to litigate and settle the disputes. Directed the evaluation of gas regulatory issues and gas-related contracts in the company's $600 million acquisition of Tenneco Oil Company's oil and gas properties in Texas and Louisiana.

1988 to 1989

*Manager of Gas Marketing*
Fina Oil and Chemical Company

Enhanced the company's direct sales of gas to northeastern LDC's, reducing its dependency on brokers from 95% of non-dedicated company production to less than 15%. Negotiated the company's first long-term, firm sales agreement with a northeastern LDC. Recruited and trained the necessary personnel to buy, ship, and resell third party gas under spot and long-term contracts.

AGC-012672

1983 to 1986   *Manager, Gas Administration*
Fina Oil and Chemical Company

Restored consistent production from the company's most significant producing property by seeking assignments of firm capacity in HIOS and UTOS from the former interstate pipeline purchaser.  Obtained FERC approval of the assignments, the first to a non-interstate pipeline shipper.

Recommended and negotiated the acquisition of facilities for the creation of a Hinshaw pipeline to serve the company's refinery in Big Spring, Texas; the construction of a second Hinshaw pipeline to serve the company's refinery in Port Arthur, Texas; and the acquisition of facilities for a third Hinshaw pipeline to serve the company's gas lift operations in Terrebonne Parish, Louisiana.  Responsibilities included certificate applications and tariff filings before state regulatory agencies, budgeting and forecasting revenues, and negotiating upstream gas transportation agreements, gas supply contracts, and gas sales agreements.

1979 to 1983   *Attorney, Legal Department*
Fina Oil and Chemical Company

Designed the company's compliance program for hazardous waste disposal, including coordination of labeling and documentation standards; compiled the company's first filing in response to Superfund regulations, reporting all potential hazardous waste disposal sites.

Participated with the Assistant Treasurer in negotiating the terms of seventeen major revolving credit agreements with U.S. and foreign banks.

Assisted the General Counsel in preparation for board meetings, drafted board resolutions, and maintained corporate minutes; acted as secretary and maintained the corporate minute books for numerous subsidiaries.

**EDUCATION**

Juris Doctorate, University of Oklahoma, 1979
Oxford University Summer Law Program, 1977
Bachelor of Arts in History, University of Oklahoma, 1976

*Honors*:   Am Jur Award for Conflicts
Dean's List
President's Leadership Class Scholarship

**PROFESSIONAL DEVELOPMENT**

Harvard Summer Program, Center for Negotiation
National Institute for Trial Advocacy
Brookings Institution, Center for Public Policy Education
Speaker, Dallas Bar Association, Texas Bar Association & University of Texas School of Law
Attendee of numerous seminars and conferences, including PublicUtility Finance & Accounting

**PROFESSIONAL ASSOCIATIONS**

Past Council Member, State Bar of Texas Oil, Gas and Energy Resources Law Section
Chairman 2004, Energy Law Section of the Dallas Bar Association
Texas & Oklahoma Bar Associations, and Dallas Bar Association
Leadership Texas 2012

*References and further data on request.*

CONFIDENTIAL

AGC-012673

## KRIS L. TERRY

## SELECTED CONSULTING EXPERIENCE

1.  <u>Mary A. Johnson, a/k/a Mary Ann Johnson, as Trustee under the Mary A. Johnson Trust, et al. v. Range Resources-Appalachia, LLC</u>; Private Arbitration

    Issue:          Confidential

    Retained by:    Range Resources-Appalachia, LLC

    Testimony:      Hearing (2020)

2.  <u>In Re: Chesapeake Barnett Royalty Litigation #2; Village Creek Equities I, Ltd., et al. v. Chesapeake Exploration, L.L.C., et al.</u>; MDL No. 48-000000-15; In the Judicial District Court of Johnson County, Texas; Trial Court No. DC-C201500227

    Issue:          Plaintiffs alleged an underpayment of royalties

    Retained by:    The Chesapeake Defendants

    Testimony:      Trial (2020)

3.  <u>In Re:  Chesapeake Barnett Royalty Litigation #2; Black Stone Minerals Company, L.P. v. Chesapeake Operating, L.L.C., et al.</u>; MDL No. 96-000003-15; In the Judicial District Court of Tarrant County, Texas; Trial Court No. DC-C2016-00447

    Issue:          Plaintiff alleged an underpayment of royalties

    Retained by:    The Chesapeake Defendants

    Testimony:      Deposition (2019)

4.  <u>Gerald Ulibarri, et al. v. Southland Royalty Company</u>; Case No. 1:16-cv-00215-RB-JHR; In the United States District Court for the District of New Mexico

    Issue:          Plaintiff alleged royalty underpayment under certain lease forms

    Retained by:    Southland Royalty Company

    Testimony:      Hearing (2019)

5.  <u>George M. Fligiel, et al. v. Chesapeake Exploration, L.L.C., et al.</u>; Case No. 01-17-00041895; American Arbitration Association

    Issue:          Plaintiff alleged underpayment of oil and gas royalties

    Retained by:    Chesapeake Exploration, L.L.C., et al.

    Testimony:      Deposition (2019)

CONFIDENTIAL                                                                                    AGC-012674

6.  Chieftain Royalty Company v. Unit Petroleum Company; Case No. CJ-2016-230; In the District Court of LeFlore County, Oklahoma

    Issue:          Plaintiff alleged underpayment of gas royalties

    Retained by:   Unit Petroleum Company

    Testimony:   Deposition (2019) and Hearing (2019)

7.  Richard D. Kuffa, et al. v. Statoil USA Onshore Properties, Inc.; Case No. 01-17-0005-6012; American Arbitration Association, Scranton, Pennsylvania

    Issue:          Confidential

    Retained by:   Statoil USA Onshore Properties, Inc.

    Testimony:   Deposition (2018) and Hearing (2019)

8.  Jacklin Romeo, et al. v. Antero Resources Corp.; Civil Action No. 1:17-cv-88; In the United States District Court for the Northern District of West Virginia at Clarksburg

    Issue:          Plaintiffs alleged underpayment of royalties in West Virginia

    Retained by:   Antero Resources Corporation

    Testimony:   Affidavit (2019)

9.  Black Stone Minerals Company, L.P., et al. v. Chesapeake Louisiana, L.P., et al.; Case No. 77645; In the Judicial District Court, DeSoto Parish, Louisiana

    Issue: Plaintiffs alleged underpayment of royalties and overriding royalties in Louisiana

    Retained by:   Chesapeake Louisiana, L.P. and other defendants

    Testimony:   Deposition (2019)

10.  Grayson L.L.C. (of Louisiana) v. Chesapeake Operating, L.L.C., et al.; Case No. 01-18-000-9138; American Arbitration Association

    Issue:   Confidential

    Retained by: Chesapeake Operating, L.L.C.

    Testimony: Deposition and Hearing (2019)

11.  Series 6, et al. v. Chesapeake Operating, L.L.C., et al.; In Arbitration, Houston, Texas

    Issue:   Confidential

    Retained by:   Chesapeake Exploration, L.L.C. and Chesapeake Operating, L.L.C.

    Testimony:   Hearing (2019)

AGC-012675

12. <u>Bounty Minerals, LLC v. Chesapeake Exploration, L.L.C., et al.;</u> Case No. 5:17-CV-01695-SL; In the United States District Court for the Northern District of Ohio Eastern Division

    Issue:   Plaintiff alleged CELLC underpaid royalties pertaining to leases located in Ohio

    Retained by:   Chesapeake Exploration, L.L.C. and Chesapeake Operating, L.L.C.

    Testimony:   Deposition (2019)

13. <u>Raemay Minerals, LLC, et al. v. Chesapeake Exploration, L.L.C., et al.;</u> Cause No. D-1-GN-15-005015; In the District Court of Travis County, Texas

    Issue:   Plaintiff alleged CELLC underpaid royalties pertaining to leases located in the Eagle Ford Shale

    Retained by:   Chesapeake Exploration, L.L.C. and the other defendants

    Testimony:   Deposition (2019)

14. <u>Verdeen L. Slatten, et al. v. Range Resources Corporation, et al.;</u> Case No. CJ-2013-133; In the District Court of Caddo County, Oklahoma

    Issue:   Plaintiffs alleged Range underpaid royalties and fraudulently concealed information on its check detail

    Retained by:   Range Resources Corporation

    Testimony:   Trial (2019)

15. <u>In re: Ultra Petroleum Corp., et al., Debtors; Jonah LLC, et al., v. Ultra Petroleum Corp., et al.;</u> Chapter 11, Case No. 16-32202; Adversary No. 4:16-qp-03278; In the United States Bankruptcy Court for the Southern District of Texas, Houston Division

    Issue:   The court requested testimony and briefing on the meaning and application of "market value in the field" under certain Wyoming overriding royalty instruments

    Retained by:   Ultra Petroleum Corp. and other Defendants

    Testimony:   Deposition and Trial (2018)

16. <u>In re: Connect Transport, L.L.C., et al., Debtors; White Operating Company, et al. v. Bank of America, N.A., et al.;</u> Chapter 7, Case No. 16-33971-11-hdd; Adversary No. 16-03158; In the United States Bankruptcy Court for the Northern District of Texas, Dallas Division

    Issue:   The priority of certain oil companies' liens under the Oklahoma Oil and Gas Owners' Lien Act of 2010

    Retained by:   White Operating Company and other oil companies

    Testimony:   Deposition (2018)

17. <u>In Re: Chesapeake Eagle Ford Royalty Litigation;</u> MDL Cause No. 2016C122093; In the District Court of Bexar County, Texas

    Issue: Plaintiffs alleged underpayment of royalty on oil and gas in the Eagle Ford

CONFIDENTIAL

AGC-012676

Retained by:    Chesapeake Defendants and other working interest owners

Testimony:    Deposition (2018) (Dimmit and LaSalle Counties) Trial (LaSalle) (2019)

18.    <u>Dale H. Henceroth, et al. v. Chesapeake Exploraton, L.L.C.</u>; Case No. 4:15-cv-02591-BYP;  In the United States District Court for the Northern District of Ohio, Eastern Division

    Issue:    Plaintiffs alleged underpayment of royalties under various leases in the Utica Shale

    Retained by:    Chesapeake Exploration, L.L.C.

    Testimony:    Deposition and Hearing (2017)

19.    <u>In Re: Chesapeake Barnett Royalty Litigation #2</u>; MDL No. 48-000000-15; In the 48th Judicial District Court of Tarrant County, Texas

    Issue:    Plaintiffs alleged underpayment of royalties under various leases in the Barnett Shale

    Retained by:    Chesapeake Exploration, L.L.C.

    Testimony:    Deposition (2017)  Hearing (2018)

20.    <u>Richard P. Marburger, Trustee of the Olive M. Marburger Living Trust, et al. v. XTO Energy Inc</u>; Case No. 2:15-cv-00910-DSC-CRE; In the United States District Court for the Western District of Pennsylvania

    Issue:    Plaintiffs alleged underpayment of royalty on a behalf of a class of royalty owners under leases located in western Pennsylvania entered into by XTO's predecessor-in-interest

    Retained by:    XTO Energy Inc.

    Testimony:    Deposition (2017)

21.    <u>John P. Ellbogen Foundation v. Ellbogen Property Management, Ltd, et al.</u>; Civil Action No. 96858; In the District Court of Natrona County, Wyoming

    Issue:    Defendant transferred properties from one entity to another washing out the net profits holder

    Retained by:    John P. Ellbogen Foundation

    Testimony:    Deposition (2017)

22.    <u>In the Matter of the Appeal of WPX Energy, Inc. From a Decision by the Department of Revenue</u>; Docket No. 2016-31; The State Board of Equalization for the State of Wyoming

    Issue:    The Department of Revenue disallowed firm transportation expenses incurred by WPX related to the payment of severance taxes in Wyoming

    Retained by:    WPX Energy, Inc.

    Testimony:    Hearing (2016)

AGC-012677

23. <u>Tony R. Whisenant v. Strat Land Exploration Co.</u>; Case No. CJ-2014-4; In the District Court of Beaver County, Oklahoma

   Issue:   Plaintiff sought certification of a class alleging the Defendant underpaid royalties for natural gas production in Oklahoma

   Retained by:   Strat Land Exploration Co.

   Testimony:   Hearing (2016)

24. <u>Paul F. Sidorek, et al. v. Chesapeake Appalachia, L.L.C.</u>; Case #011400022578; American Arbitration Association, Commonwealth of Pennsylvania

   Issue:   Claimants alleged underpayment of royalties for natural gas production in Marcellus Shale

   Retained by:   Chesapeake Appalachia, L.L.C.

   Testimony:   Hearing (2016)

25. <u>In Re: Chesapeake Barnett Royalty Litigation; MDL No. 348-000000-15; William S. Wright Jr., et al.. v. Chesapeake Energy Corporation, et al.; Case No. 017-267472-13; Tarrant County; and Bettye Haynie v. Chesapeake Operating, Inc.; Case No. C2013-00376; Johnson County, Texas; Texas Mesa Vista 2000, Ltd. v. Chesapeake Operating, Inc.</u>; Case No. 048-27136314; Tarrant County, Texas

   Issue: Plaintiffs alleged underpayment of royalties for natural gas production in the Barnett Shale

   Retained by:   Chesapeake Operating, Inc.

   Testimony:   Depositions (2016)

26. <u>Jennifer McKnight, et al. v. Linn Operating, Inc,, et al.</u>; Case No. 10-CV-00030-R; In the United States District Court for the Western District of Oklahoma

   Issue:   Plaintiff sought certification of a class alleging the Defendant under paid royalties for natural gas production in Oklahoma

   Retained by:   Linn Operating, Inc.

   Testimony:   Deposition (2012) and Hearing (2016)

CONFIDENTIAL

# Exhibit B

# Documents Reviewed

Expert Report of Kris L. Terry

| 1. | Plaintiffs' Initial Disclosures | 7/3/18 |
|---|---|---|
| 2. | Antero's Initial Disclosures | 7/3/18 |
| 3. | Antero's Document Production to Plaintiffs (AGC-000001 to AGC-001221) | Various |
| 4. | Letter to Marvin W. Masters (AGC-000001 to AGC-000752) | 8/3/18 |
| 5. | Letter to Marvin W. Masters (AGC-000753) | 8/24/18 |
| 6. | Letter to Marvin Masters with updated deduction summary (AGC-000806 to AGC-000807) | 11/20/18 |
| 7. | Marvin Masters letter requesting response to Interrogatory No. 1 prior to meeting on 01/15/19 | 1/10/19 |
| 8. | Letter to Marvin Masters with updated deduction summary (AGC-000808) [sent by email] | 2/20/19 |
| 9. | Deduction summary (AGC-000809) [sent by email] | 2/21/19 |
| 10. | Letter to Marvin Master (AGC-000810) | 3/20/19 |
| 11. | Letter to Marvin Masters with explanation of the NGL upgrade calculation | 4/9/19 |
| 12. | Letter to Marvin Masters with listing of leases from the second amended complaint (AGC-000811 to AGC-001039 | 5/10/19 |
| 13. | Email to Marvin Masters in response to 05/24/19 question following meeting on 05/22/19 | 5/29/19 |
| 14. | Letter to Marvin Masters supplementing Antero's discovery responses and responding to 6/19/19 question | 6/25/19 |
| 15. | Email to Marvin Masters (AGC-001040 to AGC-001056) | 7/1/19 |
| 16. | Email to Marvin Masters (AGC-001057 to AGC-001059) | 8/6/19 |
| 17. | Email to Marvin Masters (AGC-001060 to AGC-001070) | 11/6/19 |
| 18. | Email to Marvin Masters (AGC-001071 to AGC-001100) | 11/14/19 |
| 19. | Letter to Marvin Masters with list of purchasers | 11/20/19 |
| 20. | Email to Marvin Masters with gas analyses (AGC-001101 to AGC-001221) | 11/21/19 |

CONFIDENTIAL

| 21. | Antero's document production (AGC-001222 to AGC-011057) | Various |
|---|---|---|
| 22. | Letter to Marvin Masters | 12/30/19 |
| 23. | Plaintiffs' document production – Exhibit A3, Exhibit A4 and Plaintiffs' Answers and Responses to Antero's First Set of Combined Discovery Requests | 1/10/19 |
| 24. | Plaintiffs' Second Amended Complaint | 6/11/18 |
| 25. | Plaintiffs' Initial Rule 26(a)(1) Disclosures | 7/3/18 |
| 26. | Antero Resources Corporation's Answer to Second Amended Complaint | 7/3/18 |
| 27. | Antero Resources Corporation's Initial Disclosures | 7/3/18 |
| 28. | Sealed Memorandum Opinion and Order Granting in Part and Denying in Part Defendant's Motion for Judgement on the Pleadings [Dkt. No. 44] | 3/25/19 |
| 29. | Confidential Settlement Agreement and Release of All Claims | 8/--/15 |
| 30. | Plaintiffs' expert disclosure for Daniel Reineke w//COS | 2/10/20 |
| 31. | Index of Documents Provided to Experts | 2/12/20 |
| 32. | Corder Underpayment Summary Calculation spreadsheet | Undated |
| 33. | Corder Summary – All Years 7.16.2019 – FINAL | Undated |
| 34. | ACG-001057A – AGC-001059A | 1/15/20 |
| 35. | Corder Lease Map | 1/15/20 |
| 36. | Antero Resources Corporation's Response to Plaintiffs' Second Set of Interrogatories to Defendant | 12/30/19 |
| 37. | Transcript of the deposition of Daniel Reineke | 2/28/20 |
| 38. | Transcript of the deposition of John Michael Cottrill | 2/3/20 |
| 39. | Transcript of the deposition of Teresa Corder-Erickson | 2/5/20 |
| 40. | Transcript of the deposition of Garnet Cottrill | 2/3/20 |
| 41. | Transcript of the deposition of Janet Packard | 2/4/20 |
| 42. | Transcript of the deposition of Leroy Packard | 2/4/20 |
| 43. | Transcript of the deposition of Marlyn Sigmon | 2/4/20 |
| 44. | Transcript of the deposition of Gerald Corder | 2/5/20 |

CONFIDENTIAL

AGC-012680

| 45. | Transcript of the deposition of Tracy Bridge | 2/5/20 |
| 46. | Transcript of the deposition of Randall Corder | 2/6/20 |
| 47. | Transcript of the deposition of Lorena Krafft | 2/6/20 |
| 48. | Transcript of the deposition of Angela Nicholson | 2/6/20 |
| 49. | Transcript of the deposition of Kevin McCall | 2/7/20 |
| 50. | Transcript of the deposition of Brian McCall | 2/7/20 |
| 51. | Transcript of the deposition of Cheryl Morris | 2/7/20 |

CONFIDENTIAL

AGC-012681

**EXHIBIT C**

1.  **Type:** C1

    **Sub-Type:** A

    **Form:** WV-PA Revised — ARAC/PAL Rev. June-09

    **Date:** 7/24/2012

    **Lessor:** Garnet Cottrill (Plaintiffs' Exhibit 2F); Marlyn Sigmon (Plaintiffs' Exhibit 2N); Janet & Leroy Packard (Plaintiffs' Exhibit 2M)

    **Lessee:** Antero Resources Appalachian Corp.

    **Royalty Clause:**

    3. Royalties. The royalties to be paid by Lessee are: (a) on oil, One-Eighth (12.5%) of that produced and saved and delivered at the wells or into the pipeline to which the wells may be connected. Lessee may from time to time purchase any royalty oil in its possession and pay Lessor the price received by Lessee for such oil computed at the well, less One-Eighth (12.5%) of all Post-Production Costs and less the same fractional share of all production, petroleum excise and severance taxes; (b) on gas, included casinghead gas or other gaseous substance, produced from said land and sold or used beyond the well or for the extraction of gasoline or other product, an amount equal to One-Eighth (12.5%) of the net amount realized by Lessee computed at the wellhead from the sale of such substances. On gas sold at the well, the royalty shall be One-Eighth (12.5%) of the amount realized by Lessee from such sale, less One-Eighth (12.5%) of all Post-Production Costs and less the same fractional share of all production, petroleum excise and severance taxes.

    As used in this provision, "Post-Production Costs" shall mean all costs actually incurred by Lessee or its affiliate and all losses of produced volumes whether by use as fuel, line loss, flaring, venting, or otherwise from and after the wellhead to the point of sale. Post-Production Costs include, without limitation, all costs of gathering, treating, processing, blending, marketing, compression, dehydration, transportation, removal of liquid or gaseous substances, and/or removal of impurities of or from the affected oil and gas, and costs of any other activities  associated with making the oil and gas ready for movement, sale, or use. For royalty calculation purposes, Lessee shall never be required to adjust the sales proceeds to account for the purchaser's revenues, receipts, costs or charges, or other activities that occur beyond and past the point of sale. Lessee or its affiliate shall have the right to construct, maintain and operate any facilities providing some or all of the services identified as Post-Production Costs. If Lessee or its affiliate does so, the actual costs of such facilities shall be included in the Post-Production Costs as a per barrel or per mcf (or per MMBtu, at Lessee's election) charge, as appropriate, calculated by spreading the construction, maintenance and operating costs for such facilities over the reasonably estimated total production volumes attributable to the well or wells using such facilities.

    In no event will the royalties payable hereunder exceed One-Eighth (12.5%) of any governmentally-imposed sale price ceiling applicable to Lessee's sales or One-Eighth (12.5%) of the net amounts received by Lessee not subject to refund, whichever is the

AGC-012682

lesser; provided that any amounts held by Lessee subject to refund will be promptly distributed, without interest, when Lessee's sale price is finally determined by judicial or administrative authority. Payment of royalties hereunder shall be made or tendered on or before the end of the month following the production month, beginning no later than six (6) months after Date of First Sales.

**Additional Provisions:** N/A

**Exhibit/Amendment Provisions:**

Exhibit A

All reference herein made to One-Eighth (12 1/2%) royalty are hereby amended to read Fifteen (15.0%) percent royalty.

Market Enhancement (Gross Proceeds) Clause

It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering , storing, separating, treating, dehydrating, compressing, processing, transporting. and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

2. **Type:** C2

   **Sub-Type:** N/A

   **Form:** N/A

   **Date:** 6/29/1979

   **Lessor:** James & Pearl Corder (Plaintiffs' Exhibit 3A; Plaintiffs' Exhibit 4A) ("1979 Gerald Corder Lease"; "1979 Randall Corder Lease")

   **Lessee:** C.W. Mutschelknaus

   **Royalty Clause:**

   In Consideration of the Premises the said party of the second part, covenants and agrees:

   1st—to deliver to the credit of the Lessors, their heirs or assigns, free of cost, in the pipe line to which Lessee may connect its wells, THEN the equal one-eighth (1/8) part of all oil produced and saved from the leased premises; and second, to pay one-eighth (1/8) of the

CONFIDENTIAL

AGC-012683

value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm.

The Lessee shall not be required in any event to increase the rate of said gas well payments or said royalty of oil by reason of any royalty or interest in said oil or gas that may have been heretofore sold, reserved or conveyed by Lessors or their predecessor in title or otherwise. And any such outstanding royalty or interest shall first be deducted from the royalties and rentals above provided to be paid or delivered.

It is agreed by the parties hereto that the Lessee, its successors or assigns, shall have the right to use off the farm for such purposes as it may desire, "Casing Head Gas," (being gas produced from wells on the premises), but if said "casing head gas" or any part thereof should be manufactured into gasoline or other by-products by said company, said Lessors shall receive one-eighth of the net value at the factory of the gasoline and other by-products so manufactured.

**Additional Provisions:** N/A

**Exhibit/Amendment Provisions:** N/A

3.  **Type:** C3

    **Sub-Type:** N/A

    **Form:** Type Written

    **Date:** 5/15/1981

    **Lessor:** James & Pearl Corder (Plaintiffs' Exhibit 5A) ("1981 Roger Corder Lease")

    **Lessee:** J.R. Hornor

    **Royalty Clause:**

    4. ROYALTIES TO BE PAID: The Lessee shall pay or deliver to the Lessors their proportionate share (meaning one-half (1/2)) of royalties for oil and/or natural gas produced from the Leased Premises as follows:

    (a) Lessee shall deliver to the credit of the Lessors, free of cost in the tanks, pipelines, or other facilities to which the Lessee may connect his well, a royalty of one-eighth (1/8th) of all oil produced and saved from the Leased Premises; and

    (b) Lessee shall pay a royalty for all gas produced, saved, and marketed from the Leased Premises equal to one-eighth (1/8th) of the price received by the Lessee from the sale of such gas. Said payments shall be paid to Lessors monthly for all natural gas for which Lessee receives payment during the preceding calendar quarter.

CONFIDENTIAL

AGC-012684

**Additional Provisions:**

5. FREE GAS: Lessors except and reserve the right to lay a pipeline, at their own expense, to any well producing gas or production pipeline on the Leased Premises, and to take gas produced from such well to an amount not exceeding three hundred thousand (300,000) cubic feet per year free of cost for the Lessors' own use for heat and light in one dwelling house on said Leased Premises at the Lessors' risk, subject to the use, operations, pumping, and right of abandonment of any such well by the Lessee. The Lessors agree that all gas in excess of three hundred thousand (300,000) cubic feet taken and used in each year shall be paid for by the Lessors at the current rates of the Lessee, that the measurement and regulation thereof shall be by meter and regulators set at the valve on the well, that such gas so taken shall be used with economy, in safe and proper pipes and appliances, and that the Lessors shall subscribe to and be bound by the reasonable rules and regulations of the Lessee at that time relating to such taking and use of gas.

**Exhibit/Amendment Provisions:** N/A

4.     **Type:** C4

**Sub-Type:** N/A

**Form:** N/A

**Date:** 8/20/1979

**Lessor:** H.D. Nicholson et al. (Plaintiffs' Exhibit 6A; Plaintiffs' Exhibit 7A)

**Lessee:** Doran & Assoc., Inc.

**Royalty Clause:**

2. (a) Lessee covenants and agrees to deliver to the credit of Lessor, his heirs or assigns, free of costs, in the pipe line to which said Lessee may connect its wells, a royalty of one-eighth (1/8) of native oil produced and saved from the leased premises.

(b) Lessee covenants and agrees to pay Lessor as a royalty for the native gas from each and every well drilled on said premises producing native gas, an amount equal to one-eighth (1/8) of the gross proceeds received from the sale of same at the prevailing price for gas sold at the well, for all native gas saved and marketed from the said premises, payable quarterly.

**Additional Provisions:**

14. It is agreed that said Lessee shall have the privilege of using free of charge sufficient water, oil, and gas from the said premises to run all machinery necessary for drilling and

CONFIDENTIAL

AGC-012685

operations thereon, and at any time to remove all machinery and fixtures placed on said premises.

**Exhibit/Amendment Provisions:** N/A

5.    **Type:** C5

**Sub-Type:** N/A

**Form:** N/A

**Date:** 10/3/1985

**Lessor:** Oma Corder (Plaintiffs' Exhibit 9)

**Lessee:** C.W. Mutschelknaus

**Royalty Clause:**

In consideration of the premises the said party of the second part, covenants and agrees: First, to deliver to the credit of the Lessors, their heirs or assigns, free of cost, in the pipe line to which Lessee may connect its wells, Lessors' proportionate share of the equal one-eighth (1/8) part of all oil produced and saved from the leased premises; and second, to pay monthly Lessors' proportionate share of the one-eighth (1/8) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm, and to pay monthly Lessors' proportionate share of the one-eighth (1/8th) of the net value at the factory of the gasoline and other gasoline products manufactured from casinghead gas.

The Lessee shall not be required in any event to increase the rate of said gas well or casinghead gas payments or said royalty of oil by reason of any royalty or interest in said oil or gas that may have been heretofore sold, reserved or conveyed by Lessors or their predecessors in title or otherwise. And any such outstanding royalty or interest shall first be deducted from the royalties and rentals above provided to be paid or delivered.

**Additional Provisions:**

If (and only if) Lessors or any third party claiming under Lessors are entitled to receive free gas, whether by virtue of the ownership of the surface of the leased premises and all the oil and gas underlying the same; of the surface of the leased premises and an undivided interest in the oil and gas underlying the same; or of the surface of the leased premises and the express record right to receive free gas, then Lessors or such third party may lay a line to any well producing gas only on said land, and take gas produced from said well for their own use on said land at their own risk and expense, subject to the use, operation, pumping, and right of abandonment of the well by the Lessee; the first two hundred thousand (200,000) cubic feet of gas so taken in each year shall be free, but all gas in excess of two hundred thousand (200,000) cubic feet taken in each year shall be paid for by the Lessors or such third party at the same rate at which Lessee sells the remaining gas from said well

5

AGC-012686

to other third parties, which rate may vary from time to time, and measurement and regulation shall be by meter and regulators set at the tap on the well. This privilege is upon condition that the Lessors or such third party shall use gas with economy, in safe and proper pipes and appliances, and shall subscribe to and be bound by reasonable rules and regulations of the Lessee at such time relating to such use of gas.

**Exhibit/Amendment Provisions:** N/A

6.   **Type:** C6

**Sub-Type:** N/A

**Form:** Hand Written

**Date:** 4/8/1896

**Lessor:** J.A.L. Day, et ux. (Plaintiffs' Exhibit 8A)

**Lessee:** R. A. Garrett

**Royalty Clause:**

Second party agrees to deliver in pipe lines to the credit of first party free of cost, the equal one-eighth part of all oil produced on these premises, and to pay $100 per year for each and every gas well obtained on these premises, provided gas is marketed off, payable sixty days from the date same is utilized.

**Additional Provisions:**

Second party to have the privilege of using sufficient water and gas, free of charge, from premises to run necessary engines, and to remove all machinery and fixtures placed on the premises by him, with the right of ingress and egress . . . .

**Exhibit/Amendment Provisions:** N/A

7.   **Type:** C7

**Sub-Type:** N/A

**Form:** WV- Revised September 2014-ARC

**Date:** 8/14/2015

**Lessor:** Tracy Bridge (Plaintiffs' Exhibit 2A); Lorena Krafft (Plaintiffs' Exhibit 2H); Gerald Corder (Plaintiffs' Exhibit 2C); Randall Corder (Plaintiffs' Exhibit 2E); Cheryl Morris (Plaintiffs' Exhibit 2K); Kevin McCall (Plaintiffs' Exhibit 2J); Brian McCall (Plaintiffs' Exhibit 2I); Angela Nicholson (Plaintiffs' Exhibit 2L)

**Lessee:** Antero Resources Corporation

6

AGC-012687

**Royalty Clause:**

3. Royalties. The royalties to be paid by Lessee are: (a) on oil, One-Eighth (12.5%) of that produced and saved and delivered at the wells or into the pipeline to which the wells may be connected. Lessee may from time to time purchase any royalty oil in its possession and pay Lessor the price received by Lessee for such oil computed at the well, less One-Eighth (12.5%) of all Post-Production Costs and less the same fractional share of all production, petroleum excise and severance taxes; (b) on gas, included casinghead gas or other gaseous substance, produced from said land and sold or used beyond the well or for the extraction of gasoline or other product, an amount equal to One-Eighth (12.5%) of the net amount realized by Lessee computed at the wellhead from the sale of such substances. On gas sold at the well, the royalty shall be One-Eighth (12.5%) of the amount realized by Lessee from such sale, less One-Eighth (12.5%) of all Post-Production Costs and less the same fractional share of all production, petroleum excise and severance taxes.

As used in this provision, "Post-Production Costs" shall mean all costs actually incurred by Lessee or its affiliate and all losses of produced volumes whether by use as fuel, line loss, flaring, venting, or otherwise from and after the wellhead to the point of sale. Post-Production Costs include, without limitation, all costs of gathering, treating, processing, blending, marketing, compression, dehydration, transportation, removal of liquid or gaseous substances, and/or removal of impurities of or from the affected oil and gas, and costs of any other activities  associated with making the oil and gas ready for movement, sale, or use. For royalty calculation purposes, Lessee shall never be required to adjust the sales proceeds to account for the purchaser's revenues, receipts, costs or charges, or other activities that occur beyond and past the point of sale. Lessee or its affiliate shall have the right to construct, maintain and operate any facilities providing some or all of the services identified as Post-Production Costs. If Lessee or its affiliate does so, the actual costs of such facilities shall be included in the Post-Production Costs as a per barrel or per mcf (or per MMBtu, at Lessee's election) charge, as appropriate, calculated by spreading the construction, maintenance and operating costs for such facilities over the reasonably estimated total production volumes attributable to the well or wells using such facilities.

**Additional Provisions:**

Audit Clause:  Lessee further grants to Lessor or Lessor's representative the right annually to examine, audit, or inspect books, records, and accounts of Lessee pertinent to the purpose of verifying the accuracy of reports and statements furnished to Lessor and for checking the amount of payments lawfully due the Lessor under the terms of this agreement.  Lessor and/or Lessor's Agent shall be allowed to audit Lessee's records no more than once per year.  In exercising this right, Lessor shall give Lessee notice of Lessor's intended audit by certified mail.  Lessee shall schedule a time for Lessor or Lessor's representative to visit the office of Lessee  to conduct said audit within thirty (30) days of the notice of Lessor.  Lessor agrees to maintain the confidentiality of all records and agrees that it will not provide access to these records to anyone.  Lessor further agrees not to

CONFIDENTIAL

AGC-012688

publicly publish or post such records by any medium.  Lessor is solely responsible for the cost of this audit.

**Exhibit/Amendment Provisions:**

All references herein to One-Eighth (12.5%) royalty are hereby amended to read Nine-Fiftieths (18%) royalty.

Market Enhancement (Gross Proceeds) Clause

It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering , storing, separating, treating, dehydrating, compressing, processing, transporting. and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

8

AGC-012689

# EXHIBIT D



AGC-012690



AGC-012691



AGC-012692



CONFIDENTIAL

AGC-012693

EXHIBIT A


**KRIS L. TERRY**
KRIS TERRY & ASSOCIATES, INC.
3232 VILLANOVA
DALLAS, TEXAS 75225
214 750-1775
kt@kristerry.com


## PROFESSIONAL EXPERIENCE

1989
To Present
*President*
Kris Terry & Associates, Inc.

Established an oil and natural gas consulting firm to provide clients the following services: evaluating, negotiating, and documenting stock and asset acquisitions; marketing gas directly to end users; securing firm and interruptible transportation in support of direct marketing efforts; and litigation support and settlement negotiations in contract disputes and regulatory proceedings.

Represented clients in federal and private royalty audits; conducted training in organizing gas control procedures and handling imbalance penalties; represented clients in interstate pipeline Order No. 636 restructuring proceedings; assisted clients in resolving gas imbalances and negotiating gas balancing agreements.

Consulted with clients on oil and gas accounting and royalty payment matters, including proceeds accounting and market value analysis; analyzed payment records, the sale of crude oil at the lease and at market centers, gas processing and the sale of liquids; and reviewed allocation and gas control issues.

1986 to 1989
*Manager of Regulatory Affairs and Litigation*
Fina Oil and Chemical Company

Developed, obtained management approval for, and implemented the company's strategic plans for decreasing its reliance on traditional pipeline purchasers for the disposition of company production by increasing its reliance on selling gas directly to purchasers in consuming regions. Responsibilities included terminating old business relationships and negotiating new ones in furtherance of those strategic plans and participating in more than 70 FERC rate and certificate proceedings that affected the new business relationships.

Organized the company's litigation response to reductions in purchases by pipelines under long-term contracts. Selected outside counsel and testifying and consulting experts to develop and pursue claims of $175 million against nine major interstate and intrastate pipelines. Developed and obtained management approval of strategy to litigate and settle the disputes. Directed the evaluation of gas regulatory issues and gas-related contracts in the company's $600 million acquisition of Tenneco Oil Company's oil and gas properties in Texas and Louisiana.

1988 to 1989
*Manager of Gas Marketing*
Fina Oil and Chemical Company

Enhanced the company's direct sales of gas to northeastern LDC's, reducing its dependency on brokers from 95% of non-dedicated company production to less than 15%. Negotiated the company's first long-term, firm sales agreement with a northeastern LDC. Recruited and trained the necessary personnel to buy, ship, and resell third party gas under spot and long-term contracts.

CONFIDENTIAL

AGC-012766

1983 to 1986    *Manager, Gas Administration*
                Fina Oil and Chemical Company

Restored consistent production from the company's most significant producing property by seeking assignments of firm capacity in HIOS and UTOS from the former interstate pipeline purchaser. Obtained FERC approval of the assignments, the first to a non-interstate pipeline shipper.

Recommended and negotiated the acquisition of facilities for the creation of a Hinshaw pipeline to serve the company's refinery in Big Spring, Texas; the construction of a second Hinshaw pipeline to serve the company's refinery in Port Arthur, Texas; and the acquisition of facilities for a third Hinshaw pipeline to serve the company's gas lift operations in Terrebonne Parish, Louisiana. Responsibilities included certificate applications and tariff filings before state regulatory agencies, budgeting and forecasting revenues, and negotiating upstream gas transportation agreements, gas supply contracts, and gas sales agreements.

1979 to 1983    *Attorney, Legal Department*
                Fina Oil and Chemical Company

Designed the company's compliance program for hazardous waste disposal, including coordination of labeling and documentation standards; compiled the company's first filing in response to Superfund regulations, reporting all potential hazardous waste disposal sites.

Participated with the Assistant Treasurer in negotiating the terms of seventeen major revolving credit agreements with U.S. and foreign banks.

Assisted the General Counsel in preparation for board meetings, drafted board resolutions, and maintained corporate minutes; acted as secretary and maintained the corporate minute books for numerous subsidiaries.

## EDUCATION

Juris Doctorate, University of Oklahoma, 1979
Oxford University Summer Law Program, 1977
Bachelor of Arts in History, University of Oklahoma, 1976

*Honors*:   Am Jur Award for Conflicts
            Dean's List
            President's Leadership Class Scholarship

## PROFESSIONAL DEVELOPMENT

Harvard Summer Program, Center for Negotiation
National Institute for Trial Advocacy
Brookings Institution, Center for Public Policy Education
Speaker, Dallas Bar Association, Texas Bar Association & University of Texas School of Law
Attendee of numerous seminars and conferences, including PublicUtility Finance & Accounting

## PROFESSIONAL ASSOCIATIONS

Past Council Member, State Bar of Texas Oil, Gas and Energy Resources Law Section
Chairman 2004, Energy Law Section of the Dallas Bar Association
Texas & Oklahoma Bar Associations, and Dallas Bar Association
Leadership Texas 2012

*References and further data on request.*

CONFIDENTIAL

## KRIS L. TERRY

## SELECTED CONSULTING EXPERIENCE

1.  Richard L. Armstrong and Donald L. Reynolds v. Antero Resources Corporation; Civil Action No. 1:19-CV-173 (Consolidated with 1:19-CV-174); In the United States District Court for the Northern District of West Virginia, Clarksburg Division

    Issue:         Plaintiffs asserted a royalty underpayment claim

    Retained by:   Antero Resources Corporation

    Testimony:     Deposition (2020)

2.  In Re: Bullseye Energy, LLC, Debtor; Case No. 20-11144-R; In the United States Bankruptcy Court for the Northern District of Oklahoma

    Issue:    A putative class of royalty owners filed a motion to dismiss the bankruptcy proceeding

    Retained by:   Bullseye Energy, LLC

    Testimony:     Hearing (2020)

3.  Marcus Huey, et al. v. EQT Production Company, et al.; Case No. 17-C-43; In the Circuit Court of Wetzel County, West Virginia

    Issue:         Plaintiffs asserted a royalty underpayment under a flat rate lease

    Retained by:   EQT Defendants

    Testimony:     Deposition (2020)

4.  Brian Eaton, et al and Cunningham Property Management Trust v. Ascent Resources-Utica, LLC; Case No. 2:19-CV-3412; Chief Judge Edmund A. Sargus, Jr.; In the United States District Court for the Southern District of Ohio, Eastern Division

    Issue:         Plaintiff alleged underpayment of gas royalties

    Retained by:   Ascent Resources-Utica, LLC

    Testimony:     Depositions (2020)

5.  Chieftain Royalty Company, et al. v. BP America Production Company; Case No. 18-CV-54; In the United States District Court for the Northern District of Oklahoma

    Issue:         Plaintiffs contended BP America Production Company failed to pay interest on alleged late payments under the Oklahoma PRSA

    Retained by:    BP America Production Company

    Testimony:     Deposition (2020)

AGC-012768

6.  ETC Texas Pipeline, Ltd. v. XTO Energy, Inc.; Cause No. DC-06334; In the District Court of Dallas County, 101st Judicial District, Dallas County, Texas

> Issue: ETC filed a Request for an Injunction pertaining to a gathering and processing agreement
>
> Retained by: XTO Energy, Inc.
>
> Testimony: Injunction Hearing (2020)

7.  Mary A. Johnson, a/k/a Mary Ann Johnson, as Trustee under the Mary A. Johnson Trust, et al. v. Range Resources-Appalachia, LLC; Private Arbitration

> Issue: Confidential
>
> Retained by: Range Resources-Appalachia, LLC
>
> Testimony: Hearing (2020)

8.  In Re: Chesapeake Barnett Royalty Litigation #2; Village Creek Equities I, Ltd., et al. v. Chesapeake Exploration, L.L.C., et al.; MDL No. 48-000000-15; In the Judicial District Court of Johnson County, Texas; Trial Court No. DC-C201500227

> Issue: Plaintiffs alleged an underpayment of royalties
>
> Retained by: The Chesapeake Defendants
>
> Testimony: Trial (2020)

9.  In Re: Chesapeake Barnett Royalty Litigation #2; Black Stone Minerals Company, L.P. v. Chesapeake Operating, L.L.C., et al.; MDL No. 96-000003-15; In the Judicial District Court of Tarrant County, Texas; Trial Court No. DC-C2016-00447

> Issue: Plaintiff alleged an underpayment of royalties
>
> Retained by: The Chesapeake Defendants
>
> Testimony: Deposition (2019)

10. Gerald Ulibarri, et al. v. Southland Royalty Company; Case No. 1:16-cv-00215-RB-JHR; In the United States District Court for the District of New Mexico

> Issue: Plaintiff alleged royalty underpayment under certain lease forms
>
> Retained by: Southland Royalty Company
>
> Testimony: Hearing (2019)

11. George M. Fligiel, et al. v. Chesapeake Exploration, L.L.C., et al.; Case No. 01-17-00041895; American Arbitration Association

> Issue: Plaintiff alleged underpayment of oil and gas royalties
>
> Retained by: Chesapeake Exploration, L.L.C., et al.

AGC-012769

Testimony:      Deposition (2019)

12.   Chieftain Royalty Company v. Unit Petroleum Company; Case No. CJ-2016-230; In the District Court of LeFlore County, Oklahoma

Issue:          Plaintiff alleged underpayment of gas royalties

Retained by:    Unit Petroleum Company

Testimony:      Deposition (2019) and Hearing (2019)

13.   Richard D. Kuffa, et al. v. Statoil USA Onshore Properties, Inc.; Case No. 01-17-0005-6012; American Arbitration Association, Scranton, Pennsylvania

Issue:          Confidential

Retained by:    Statoil USA Onshore Properties, Inc.

Testimony:      Deposition (2018) and Hearing (2019)

14.   Jacklin Romeo, et al. v. Antero Resources Corp.; Civil Action No. 1:17-cv-88; In the United States District Court for the Northern District of West Virginia at Clarksburg

Issue:          Plaintiffs alleged underpayment of royalties in West Virginia

Retained by:    Antero Resources Corporation

Testimony:      Affidavit (2019)

15.   Black Stone Minerals Company, L.P., et al. v. Chesapeake Louisiana, L.P., et al.; Case No. 77645; In the Judicial District Court, DeSoto Parish, Louisiana

Issue:          Plaintiffs alleged underpayment of royalties and overriding royalties in Louisiana

Retained by:    Chesapeake Louisiana, L.P. and other defendants

Testimony:      Deposition (2019)

16.   Grayson L.L.C. (of Louisiana) v. Chesapeake Operating, L.L.C., et al.; Case No. 01-18-000-9138; American Arbitration Association

Issue:          Confidential

Retained by:    Chesapeake Operating, L.L.C.

Testimony:       Deposition and Hearing (2019)

17.   Series 6, et al. v. Chesapeake Operating, L.L.C., et al.; In Arbitration, Houston, Texas

Issue:          Confidential

Retained by:    Chesapeake Exploration, L.L.C. and Chesapeake Operating, L.L.C.

Testimony:      Hearing (2019)

CONFIDENTIAL

18. Bounty Minerals, LLC v. Chesapeake Exploration, L.L.C., et al.; Case No. 5:17-CV-01695-SL; In the United States District Court for the Northern District of Ohio Eastern Division

    Issue: Plaintiff alleged CELLC underpaid royalties pertaining to leases located in Ohio

    Retained by: Chesapeake Exploration, L.L.C. and Chesapeake Operating, L.L.C.

    Testimony: Deposition (2019)

19. Raemay Minerals, LLC, et al. v. Chesapeake Exploration, L.L.C., et al.; Cause No. D-1-GN-15-005015; In the District Court of Travis County, Texas

    Issue: Plaintiff alleged CELLC underpaid royalties pertaining to leases located in the Eagle Ford Shale

    Retained by: Chesapeake Exploration, L.L.C. and the other defendants

    Testimony: Deposition (2019)

20. Verdeen L. Slatten, et al. v. Range Resources Corporation, et al.; Case No. CJ-2013-133; In the District Court of Caddo County, Oklahoma

    Issue: Plaintiffs alleged Range underpaid royalties and fraudulently concealed information on its check detail

    Retained by: Range Resources Corporation

    Testimony: Trial (2019)

21. In re: Ultra Petroleum Corp., et al., Debtors; Jonah LLC, et al., v. Ultra Petroleum Corp., et al.; Chapter 11, Case No. 16-32202; Adversary No. 4:16-qp-03278; In the United States Bankruptcy Court for the Southern District of Texas, Houston Division

    Issue: The court requested testimony and briefing on the meaning and application of "market value in the field" under certain Wyoming overriding royalty instruments

    Retained by: Ultra Petroleum Corp. and other Defendants

    Testimony: Deposition and Trial (2018)

22. In re: Connect Transport, L.L.C., et al., Debtors; White Operating Company, et al. v. Bank of America, N.A., et al.; Chapter 7, Case No. 16-33971-11-hdd; Adversary No. 16-03158; In the United States Bankruptcy Court for the Northern District of Texas, Dallas Division

    Issue: The priority of certain oil companies' liens under the Oklahoma Oil and Gas Owners' Lien Act of 2010

    Retained by: White Operating Company and other oil companies

    Testimony: Deposition (2018)

23. In Re: Chesapeake Eagle Ford Royalty Litigation; MDL Cause No. 2016C122093; In the District Court of Bexar County, Texas

    Issue: Plaintiffs alleged underpayment of royalty on oil and gas in the Eagle Ford

CONFIDENTIAL

AGC-012771

Retained by:    Chesapeake Defendants and other working interest owners

Testimony:    Deposition (2018) (Dimmit and LaSalle Counties) Trial (LaSalle) (2019)

24.    <u>Dale H. Henceroth, et al. v. Chesapeake Exploraton, L.L.C.</u>; Case No. 4:15-cv-02591-BYP; In the United States District Court for the Northern District of Ohio, Eastern Division

    Issue:    Plaintiffs alleged underpayment of royalties under various leases in the Utica Shale

    Retained by:    Chesapeake Exploration, L.L.C.

    Testimony:    Deposition and Hearing (2017)

25.    <u>In Re: Chesapeake Barnett Royalty Litigation #2</u>; MDL No. 48-000000-15; In the 48th Judicial District Court of Tarrant County, Texas

    Issue:    Plaintiffs alleged underpayment of royalties under various leases in the Barnett Shale

    Retained by:    Chesapeake Exploration, L.L.C.

    Testimony:    Deposition (2017) Hearing (2018)

26.    <u>Richard P. Marburger, Trustee of the Olive M. Marburger Living Trust, et al. v. XTO Energy Inc</u>; Case No. 2:15-cv-00910-DSC-CRE; In the United States District Court for the Western District of Pennsylvania

    Issue:    Plaintiffs alleged underpayment of royalty on a behalf of a class of royalty owners under leases located in western Pennsylvania entered into by XTO's predecessor-in-interest

    Retained by:    XTO Energy Inc.

    Testimony:    Deposition (2017)

27.    <u>John P. Ellbogen Foundation v. Ellbogen Property Management, Ltd, et al.</u>; Civil Action No. 96858; In the District Court of Natrona County, Wyoming

    Issue:    Defendant transferred properties from one entity to another washing out the net profits holder

    Retained by:    John P. Ellbogen Foundation

    Testimony:    Deposition (2017)

AGC-012772

**Exhibit B (Updated 12/16/20)**

**Documents Reviewed**

Expert Report of Kris L. Terry

| | | |
|---|---|---|
| 1. | Plaintiffs' Initial Disclosures | 7/3/18 |
| 2. | Antero's Initial Disclosures | 7/3/18 |
| 3. | Antero's Document Production to Plaintiffs (AGC-000001 to AGC-001221) | Various |
| 4. | Letter to Marvin W. Masters (AGC-000001 to AGC-000752) | 8/3/18 |
| 5. | Letter to Marvin W. Masters (AGC-000753) | 8/24/18 |
| 6. | Letter to Marvin Masters with updated deduction summary (AGC-000806 to AGC-000807) | 11/20/18 |
| 7. | Marvin Masters letter requesting response to Interrogatory No. 1 prior to meeting on 01/15/19 | 1/10/19 |
| 8. | Letter to Marvin Masters with updated deduction summary (AGC-000808) [sent by email] | 2/20/19 |
| 9. | Deduction summary (AGC-000809) [sent by email] | 2/21/19 |
| 10. | Letter to Marvin Master (AGC-000810) | 3/20/19 |
| 11. | Letter to Marvin Masters with explanation of the NGL upgrade calculation | 4/9/19 |
| 12. | Letter to Marvin Masters with listing of leases from the second amended complaint (AGC-000811 to AGC-001039 | 5/10/19 |
| 13. | Email to Marvin Masters in response to 05/24/19 question following meeting on 05/22/19 | 5/29/19 |
| 14. | Letter to Marvin Masters supplementing Antero's discovery responses and responding to 6/19/19 question | 6/25/19 |
| 15. | Email to Marvin Masters (AGC-001040 to AGC-001056) | 7/1/19 |
| 16. | Email to Marvin Masters (AGC-001057 to AGC-001059) | 8/6/19 |
| 17. | Email to Marvin Masters (AGC-001060 to AGC-001070) | 11/6/19 |
| 18. | Email to Marvin Masters (AGC-001071 to AGC-001100) | 11/14/19 |
| 19. | Letter to Marvin Masters with list of purchasers | 11/20/19 |
| 20. | Email to Marvin Masters with gas analyses (AGC-001101 to AGC-001221) | 11/21/19 |

| 21. | Antero's document production (AGC-001222 to AGC-011057) | Various |
|---|---|---|
| 22. | Letter to Marvin Masters | 12/30/19 |
| 23. | Plaintiffs' document production – Exhibit A3, Exhibit A4 and Plaintiffs' Answers and Responses to Antero's First Set of Combined Discovery Requests | 1/10/19 |
| 24. | Plaintiffs' Second Amended Complaint | 6/11/18 |
| 25. | Plaintiffs' Initial Rule 26(a)(1) Disclosures | 7/3/18 |
| 26. | Antero Resources Corporation's Answer to Second Amended Complaint | 7/3/18 |
| 27. | Antero Resources Corporation's Initial Disclosures | 7/3/18 |
| 28. | Sealed Memorandum Opinion and Order Granting in Part and Denying in Part Defendant's Motion for Judgement on the Pleadings [Dkt. No. 44] | 3/25/19 |
| 29. | Confidential Settlement Agreement and Release of All Claims | 8/--/15 |
| 30. | Plaintiffs' expert disclosure for Daniel Reineke w/COS | 2/10/20 |
| 31. | Index of Documents Provided to Experts | 2/12/20 |
| 32. | Corder Underpayment Summary Calculation spreadsheet | Undated |
| 33. | Corder Summary – All Years 7.16.2019 – FINAL | Undated |
| 34. | AGC-001057A – AGC-001059A | 1/15/20 |
| 35. | Corder Lease Map | 1/15/20 |
| 36. | Antero Resources Corporation's Response to Plaintiffs' Second Set of Interrogatories to Defendant | 12/30/19 |
| 37. | Transcript of the deposition of Daniel Reineke | 2/28/20 |
| 38. | Transcript of the deposition of John Michael Cottrill | 2/3/20 |
| 39. | Transcript of the deposition of Teresa Corder-Erickson | 2/5/20 |
| 40. | Transcript of the deposition of Garnet Cottrill | 2/3/20 |
| 41. | Transcript of the deposition of Janet Packard | 2/4/20 |
| 42. | Transcript of the deposition of Leroy Packard | 2/4/20 |
| 43. | Transcript of the deposition of Marlyn Sigmon | 2/4/20 |
| 44. | Transcript of the deposition of Gerald Corder | 2/5/20 |

CONFIDENTIAL

AGC-012774

| 45. | Transcript of the deposition of Tracy Bridge | 2/5/20 |
|---|---|---|
| 46. | Transcript of the deposition of Randall Corder | 2/6/20 |
| 47. | Transcript of the deposition of Lorena Krafft | 2/6/20 |
| 48. | Transcript of the deposition of Angela Nicholson | 2/6/20 |
| 49. | Transcript of the deposition of Kevin McCall | 2/7/20 |
| 50. | Transcript of the deposition of Brian McCall | 2/7/20 |
| 51. | Transcript of the deposition of Cheryl Morris | 2/7/20 |
| 52. | Transcript of the deposition of Alvyn Schopp | 1/23/20 |
| 53. | Stipulation to Extend Time for Expert Disclosures & Daubert Motions | 1/30/20 |
| 54. | Antero Resource Corporation's Corrected Response to Plaintiffs' Motion to Extend the Scheduling Order | 3/31/20 |
| 55. | Second Amended Scheduling Order | 4/20/20 |
| 56. | Third Amended Scheduling Order | 9/24/20 |
| 57. | Plaintiffs' Supplemental Expert Disclosures (Reineke's Second Report) | 9/25/20 |
| 58. | AGC-012694 – AGC-012734 | 3/27/20 |
| 59. | AGC-012735 | 11/5/20 |
| 60. | AGC-012736 | 11/5/20 |
| 61. | AGC-012737 | 11/5/20 |
| 62. | AGC-012738 | 11/5/20 |
| 63. | AGC-012739 | 11/5/20 |
| 64. | AGC-012740 | 11/5/20 |
| 65. | AGC-012741 | 11/5/20 |
| 66. | AGC-012742 | 11/5/20 |
| 67. | AGC-012743 | 11/5/20 |
| 68. | AGC-012744 | 11/5/20 |
| 69. | AGC-012745 | 11/5/20 |

CONFIDENTIAL

AGC-012775

| 70. | AGC-012747 – AGC-012751 | 11/5/20 |
|-----|-------------------------|---------|
| 71. | AGC-012752 – AGC-012756 | 11/5/20 |
| 72. | AGC-012757 – AGC-012762 | 11/5/20 |
| 73. | AGC-012763 – AGC-012764 | 11/5/20 |
| 74. | AGC-012765 | 12/15/20 |

4

CONFIDENTIAL

AGC-012776