**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

GERALD CORDER,

    Plaintiff,

v.                                       Civil Action No. 1:18-CV-30
                                          Hon. Judge Irene Keeley

ANTERO RESOURCES CORPORATION,
a Delaware corporation,                c/w 1:18CV31, 1:18CV32,
                                          1:18CV32, 1:18CV32, 1:18CV32,
                                          1:18CV32, 1:18CV32, 1:18CV32,
                                          1:18CV32, 1:18CV32, for purposes of
                                          discovery and setting schedule

**PLAINTIFFS' REPLY TO ANTERO RESOURCES CORPORATION'S
RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

      Plaintiffs submit this brief in reply to Defendant Antero Resources Corporation's Response to Plaintiffs' Motion for Summary Judgment. For reasons set forth in their Motion as well as the reasons set forth below, Plaintiffs respectfully request this Court to enter and order grating Plaintiffs' Motion for Summary Judgment.

**INTRODUCTION**

      **A. Defendant Breached the Settlement Agreement and the "Market Enhancement (Gross Proceeds) Clause."**

      Plaintiffs are entitled to summary judgment because Defendant has wrongfully taken deductions from Plaintiffs' royalty for the natural gas liquids (NGLs) in violation of the plaintiffs' leases under the Settlement Agreement (hereinafter "SA") and the Market Enhancement (Gross Proceeds) Clause (hereinafter "MEC.") Plaintiffs attached the MEC as exhibits to their Second Amended Complaint. Copies of the leases containing the MEC were attached to Plaintiffs' Second Amended Complaint as Exhibits 2, 3 and 4. (Id.) Plaintiffs alleged that Defendant violated and breached its contractual duties and responsibilities to Plaintiffs for the identified leases causing Plaintiffs damages. See ECF No. 30, at p. 35, ¶¶ 81, 82. The Defendant attached the SA to its

1

answer as Exhibit C and it is part of the record in this case. Certain Plaintiffs[1] and Defendant entered into the SA after extensive negotiations in an effort to settle a partition action. (*See* Def. Memo. in Support of Mo. for Judg. on the Pleadings, at p. 4, filed under seal August 1, 2018.) Defendant also stated "Royalty deductions were patently contemplated by the Settlement Agreement and Release based on the fact that **Antero agreed to treat certain lease provisions as providing for gross royalties 'without regard to any postproduction or market enhancement costs claimed or incurred by Antero**.'" (Id. at p. 10.)

Defendant argues that "Plaintiffs are not entitled to summary judgment because they have failed to plead a breach of the Settlement Agreement, claiming that it was the sole contract raised in Plaintiffs' motion." First, Plaintiffs' motion is not solely reliant upon the language in the SA. Plaintiffs' motion is also based on the MEC which, as a part of the SA, by itself, provides a basis for Plaintiffs' motion. Second, this Court previously found and ordered that Plaintiffs had adequately pled a breach of contract claim based upon the MEC, ECF No. 29, at pp. 20-21. Also, the MEC is a part of the SA. Third, Plaintiffs' counsel was not aware of the allegations specifically relating to the SA at the time of the filing of their Second Amended Complaint due to the confidential nature of the SA which strictly prohibited Plaintiffs from disclosing it. While Plaintiffs did and could not specifically plead a violation of the SA, Plaintiffs have, pursuant to Rule 15 of the Federal Rules of Civil Procedure, filed a motion to amend their complaint to add specific allegations relating to the SA.[2]

---

[1] While Marlyn Sigmon, Garnett Cottrill and Janet Packard and Leroy Packard were not parties to the Settlement Agreement, their leases contain market enhancement provisions (ECF No. 30-2), and their leases are treated by Antero as market enhancement leases. (Doc. Id. 181-5, Reineke Supplemental Report, September 25, 2020, p. 7.)

[2] Plaintiffs reference Plaintiffs' motion to amend (ECF No. 184), and the facts and law discussed in the motion that permit such an amendment.

Nonetheless, even if the Plaintiff's complaint is not amended, the Court may still consider the SA in deciding the present motion.³ Also under Rule 56(c) of the Federal Rules of Civil Procedure, the Court may consider pleadings and materials of record. This Court previously recognized the SA as part of the record in this case: "The Settlement Agreement and Release is attached as Exhibit C to Antero's answer (Dkt. Nos. 49; 50). As an exhibit to the answer, the SA is 'a part of the pleadings for all purposes.'" ECF No. 75, at p. 12.

Moreover, the SA and the MEC were a part of the same contract, and Plaintiffs did allege in their complaints that Defendant violated and intentionally and tortuously breached their contractual duties to the Plaintiffs under their leases. Where two contracts are so connected as to be parts of the same transaction, they will be read together, and the court may look to one in construing the other. *George v. Cooper,* 15 W.Va. 666 (1879). "A written agreement, constituting single contract, need not be encompassed in one instrument as between contracting parties, but may be comprised of two or more instruments and yet be enforceable as whole, if relationship between several papers is clearly established." *Minear Coal Co. v. Miller-Todd Coal Co.,* 126 W.Va. 151, 27 S.E.2d 428 (1943). The fact that the agreement is contained in more than one instrument does not affect the validity of the contract nor the rights of the parties thereunder, *Nationwide Bowling Corp. v. Brunswick Corp.*, 281 F. Supp. 365, 367 (S.D.W. Va. 1968). The SA and the MEC, which was attached to the SA as an Exhibit and made a part of Plaintiffs' leases by way of the SA, are one contract under West Virginia law. In their complaint, Plaintiffs alleged that Defendant violated and breached its contractual duties and responsibilities to Plaintiffs for the identified leases causing Plaintiffs damages. Accordingly, Plaintiffs' have plead a breach of the

---

³ Rule 10(c) of the Federal Rule of Civil Procedure provides that a statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading **for all purposes**.

3

SA and the MEC. Alternatively, at the very least, the Court should consider and construe the SA and the MEC together as a single contract.

Paragraph 14 of the SA expressly provides that "royalties pursuant to said leases shall be deemed gross royalties and shall be calculated without regard to any postproduction or market enhancement costs claimed or incurred by Antero." The SA required Plaintiffs to execute lease modifications containing the MEC. In its Memorandum in Support of Motion for Judgment on the Pleadings, at p. 10, filed under seal August 1, 2018,) Defendant states: "Royalty deductions were patently contemplated by the Settlement Agreement and Release based on the fact that Antero agreed to treat certain lease provisions as providing for gross royalties 'without regard to any postproduction or market enhancement costs claimed or incurred by Antero.'" The MEC states that "all oil, gas and other proceeds" shall be gross, "without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form." While the MEC also provides that "any such costs which result in enhancing the value of the marketable gas, oil or other products to receive a better price may be deducted … so long as they are based on actual costs," the enhancement clause does apply here because "other products" include NGLs. There is no question here, especially when read together with the SA, that the MEC requires gross proceeds royalties for all products[4] produced under the leases and all postproduction and market enhancement costs for all products under the leases are forbidden.

---

[4] Defendant's argument that "other products" is a catchall for other products like oil and gas supports Plaintiffs' position here. Logically, natural gas liquids are products like, and of the same character as, oil and gas. *See also,* Pls' Mo. for Summ. Judg., filed under seal, at pp. 6-8, citing West Virginia and other states' statutes that define natural gas to include natural gas liquids.

Plaintiffs' interpretation of this MEC is not "tortured," as Defendant claims. Defendant's interpretation, however, incredibly would have the Court conclude that 'other products" in the first part of the MEC does not include NGLs, but that "other products" after the semi-colon (in the same sentence), allows it to take deductions for processing and transporting "other products" such as NGLs. *See* ECF No. 180, at pp. 9-10. For instance, Defendant, at page 9, argues that "other products" does not include NGLs. Defendant then argues, at Page 10, that "the disjunctive 'or' indicates that such costs need not enhance the value of *both* gas and NGLs (*i.e., 'other products'*) in order to be deductible." (italics added). Plaintiffs are not rewriting the clause to expressly name individual purity products, such as ethane and butane. Common sense, reason and logic implies that "other products" under an oil and gas lease includes NGLs. NGLs include individual products such as ethane and butane. Indeed, the definition of NGLs includes the individual products. West Virginia Code § 11-13GG-3 states: "Natural gas liquids" includes the following separated from raw natural gas: butane, ethane, isobutane, pentane, propane, and similar liquid hydrocarbons and byproducts separated from natural gas. The United States Energy Information Administration defines NGLs as hydrocarbons—in the same family of molecules as natural gas and crude oil … [e]thane, propane, butane, isobutane, and pentane are all NGLs." https://www.eia.gov/todayinenergy/detail.php?id=5930. The United States Department of Energy lists NGLs as ethane, propane, butanes (normal butane and isobutene), and natural gasoline (pentanes plus). (2017), U.S. Department of Energy, *Natural Gas Liquids Primer: With a Focus on the Appalachian Region*, Washington DC: U.S. Department of Energy. Plaintiffs' expert Daniel Reineke, P.E., who has extensive background and experience in the oil and gas industry opines that NGLs, or "other products" produced under Plaintiffs' leases include ethane, butane, etc. (Doc. Id. 181-5, Reineke Report, September 25, 2020, p. 8.) Defendant's expert, Kris Terry, agrees that

"other products" includes the "entrained liquefiables," the "NGLs," the "condensate." (**Exhibit 3**, Terry Depo. p. 66.)

Defendant also argues that the use of the word "or" rather than the word "and" in the phrase "any such costs which result in enhancing the value of the marketable oil, gas or other products" allows it "to deduct costs that increase the value of gas *only*." This argument is nonsensical and such an interpretation would directly contradict the gross proceeds clause in the same sentence, as well as the express language of the Settlement Agreement.

Further, *Carper v. Kanawha Banking & Trust Co.,* 157 W.Va. 477, 207 S.E.2d 897 (1974), relied on by Defendant, recognized that,

> courts have been urged to read "and" as "or" or vice versa, or to add one or the other to the statute. Because of inappropriate use of these words, their construction has become a necessity recognized in the rules of statutory interpretation:
>
> The popular use of "or" and "and" is so loose, and so frequently inaccurate, that it has infected statutory enactments. For this reason, their strict meaning is more readily departed from than that of other words. In this respect it is clear that the courts have power to change and will change "and" to "or" and vice versa whenever such conversion is required by the context, or is necessary to harmonize the provisions of a statute and give effect to all its provisions, or to save it from unconstitutionality, or, in general, to effectuate the obvious intention of the Legislature.

*Id.* at 517, 921.[5] "Sometimes the word 'or' is made in contacts to mean 'and' when it is proper to carry out the obvious meaning of the parties to the contact," Syl. Pt. 4, *Petty v. Fogle,* 16 W.Va. 497 (1880), and bad grammar or punctuation will not vitiate an instrument or overrule or control its meaning. *Ketchum v. Spurlock*, 34 W.Va. 597, 12 S.E. 832 (1891). The words "or" and "and" in a contract will be changed and read as "and" and "or" where it is plain they were so intended. Syl. pt. 5, *Bettman v. Harness*, 42 W. Va. 433, 26 S.E. 271, 275 (1896).

---

[5] Plaintiffs note that *Bond v. Antero Resources Corp.,* No. 2:17-CV-14, 2018 WL 3159155 (S.D.Ohio June 28, 2018), cited by Defendant did not address the arguments presented by Plaintiffs here.

Moreover, every intendment is in favor of a reasonable construction of a contact and against a harsh construction or one that might operate as a snare. *Price v. Stonega Coke, etc., Co.,* 26 F.Supp. 172, 178 (S.D.W.Va. 1938), *affd,* 106 F.2d 411 (4th Cir.), *cert. denied,* 308 U.S. 618, 60 S.Ct. 263, 84 L.Ed. 516 (1939); *see also See Stone v. United Fuel Gas Co.,* 111 W.Va. 569, 163 S.E. 48 (1932). In the construction of a written instrument, in cases of doubt, the language is to be taken most strongly against the party using it. *Id.* "The general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee." Syl. pt. 7, *Estate of Tawney v. Columbia Nat. Res., L.L.C.,* 219 W. Va. 266, 268, 633 S.E.2d 22, 24 (2006). "'Uncertainties in an intricate and involved contract should be resolved against the party who prepared it. Syllabus Point 1, *Charlton v. Chevrolet Motor Co.,* 115 W.Va. 25, 174 S.E. 570 (1934)." Syl. pt 8, *Id.*

If the language of an instrument leaves the meaning of the parties in doubt, the court will take into consideration the occasion which gave rise to it, the obvious design of the parties, and the object to be obtained, as well as the language of the instrument itself, and give effect to that construction that will best effectuate the real intent and meaning of the parties. *Blue Creek Develop. Co. v. Howell,* 101 W.Va. 748, 133 S.E. 699 (1926). In construing an ambiguous contact, three well-recognized rules of construction recognize that: (1) The intentions of the parties to the agreement must control the obligations thereunder; (2) in searching for the intentions of contracting parties, the court must examine the instrument in its entirety; and (3) words are to be considered in the context in which they are employed. *Columbia Gas Transmission Corp. v. E.I. du Pont de Nemours & Co.*, 159 W.Va. 1, 11, 217 S.E.2d 919, 925 (1975). In construing a contract, the whole instrument is to be construed; not any one provision only, but all its provisions; not the words merely in which they are expressed, but their object and purpose, as disclosed by the

7

language, by the subject matter and the condition and relation of the parties. *See White v. AAMG Construction Lending Center,* 226 W.Va. 339, 346, 700 S.E.2d 791, 798 (2010).

The main object which the parties to a contract sought to accomplish is to be considered in ascertaining their intention and the particular parts of the contract must be so construed as to harmonize with such purpose if possible. *Henderson Develop. Co. v. United Fuel Gas Co.,* 121 W.Va. 284, 3 S.E.2d 217 (1939); *Price v. Stonega Coke, etc., Co.,* 26 F.Supp. 172 (S.D.W.Va. 1938), *affd,* 106 F.2d 411 (4th Cir.), *cert. denied,* 308 U.S. 618, 60 S.Ct. 263, 84 L.Ed. 516 (1939); Syl. Pt. 3, *Edwin Miller Investments, L.L.C. v. CGP Dev. Co.*, 232 W. Va. 474, 752 S.E.2d 901 (2013). "The court must give effect to all of the language of a contact if its parts can be read together without conflict." 4A Michie's Jurisprudence, Contracts § 48.

In light of the foregoing, the language of the Settlement Agreement as well as the language of the MEC is unambiguous. However, even if the Court considers the language ambiguous, the contract must be construed in Plaintiffs' favor. The construction must be reasonable and render all of its provisions consistent and harmonious. The Defendants' interpretation is not reasonable and would create conflict between the contract provisions. The Parties' intent is controlling and Defendant made the Parties' intent clear in its Def. Memo. in Support of Mo. for Judg. on the Pleadings, at p. 10, filed under seal August 1, 2018) where it stated: "Royalty deductions were patently contemplated by the Settlement Agreement and Release based on the fact that Antero agreed to treat certain lease provisions as providing for gross royalties 'without regard to any postproduction or market enhancement costs claimed or incurred by Antero.'" The Parties' intent, the MEC, the Settlement Agreement, the subject matter of the contract, and the relation of the Parties leaves no question that the that Plaintiffs' should be paid gross proceeds royalties. There is no question here that Defendant is prohibited from deducting post production and market

enhancement costs from Plaintiffs' NGLs royalties and Plaintiffs are entitled to summary judgment.

**Plaintiffs' gas is not marketable at the wellhead.**

The gas here is not marketable at the wellhead and Defendant must bear the costs of making it marketable and getting it to market. "'If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs in exploring for, producing, marketing, and transporting the product to the point of sale. *Wellman v. Energy Resources,* 210 W.Va. 200, 557 S.E.2d 254 (2001)." Syl. Pt. 1, *Estate of Tawney v. Columbia Natural Resources, LLC,* 219 W.Va. 266, 633 S.E.2d 22 (2016). "[O]ur generally recognized rule [is] that the lessee must bear all costs of marketing and transporting the product to the point of sale." *Id*. at 272, 28. The gas here is not marketable at the wellhead. The gas is not sold at the wellhead. For the gas to be marketable at the wellhead, there must be a market. There is no evidence here that Antero sold gas at the wellhead, as there was in *Richards v. EQT Production*, No. 1:17cv50, 2018 WL 3321441 (N.D.W.Va. July 5, 2018). There is no stipulation here of where the market is, as there was in *W.W. McDonald Land Co. v. EQT Production Co.,* 983 F.Supp.2d 790 (S.D.W.Va. 2013). Further, as the court stated in *W.W. McDonald Land Co.,* and cited in *Cather v. EQT Production Company,* No. 1:17cv208, 2019 WL 3806629 (N.D.W.Va. 2019): "'After synthesizing *Wellman and Tawney*, the Southern District concluded that "lessees have a duty to bear all costs incurred until the gas reaches market.... [L]essees have an implied duty to bear all post-production costs incurred until the gas reaches the market ....' *Id*. at 802." The gas here is not marketable because midstream services must occur before the gas can be sold. "My opinion to a reasonable degree of certainty is that this gas is not a marketable product at the wellhead and midstream services must be provided in order to sell that gas and its byproducts."

9

(**Exhibit** 1 at p. 2 ¶ 7, Daniel Reineke February 25, 2020 Affidavit). Defendant's expert agrees with this and there is no issue of fact as to whether the gas is marketable at the well. No matter whether the gas is processed for NGLs or not, it must still must still undergo "dehydration, compression and gathering before" it can be delivered to the ETC Bobcat Pipeline. (Doc. Id. 190-2, at p. 14, ¶ 38.) Thus, the gas here is not marketable at the wellhead and Defendant must bear the costs of making it marketable and getting it to market.

**Defendant is not entitled to take enhancement deductions.**

Antero claims that it has not breached the Enhancement Clause because the "clauses" authorize Antero to take deductions using the "work back method" as applied in *Young v. Equinor USA Onshore Properties, Inc.*, 982 F.3d 201 (4th Circuit 2020.)

Plaintiffs' expert Daniel Reineke explained the Settlement Agreement and Enhancement Clause in his report (Plaintiffs' Motion for Summary Judgment, Exhibit 3, p. 8, filed under seal on January 15, 2021) as follows:

> "The Settlement Agreement that is referred to by Antero in the Schopp deposition is dated August 2015. The agreement provided for release of Antero and others up to the date of the agreement. Also, the agreement provided for alteration of earlier leases and added a market enhancement clause to the leases. The market enhancement clause says that notwithstanding any language:
>
> "All oil, gas, or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas, and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable gas, oil or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual costs of such enhancements."
>
> "The clause plainly provides for no costs or deductions of any kind from plaintiffs' gas or the NGL's which are part of the products included in the gas. The statement that there be no costs, direct or indirect from oil, gas and "other products" produced certainly includes NGL's, which is an "other product". Also, the "enhancement" language also includes "other products", this includes the NGL's. The first sentence says that there can be no deductions for the other products (NGL's), including deductions for separating, processing, etc. of the

10

>NGL's to put them into a marketable form. The enhancement clause could not come into play because the "other product" would include ethane, butane, etc. In addition, paragraph 14 of the agreement states that with respect to the June 29, 1979, lease provides that the royalties shall be deemed to be gross royalties and shall be calculated without regard to any post production or market enhancement costs. My opinion is that the defendant was not entitled to take deductions from the lessors' gas or liquids, including from those where they directed PRC2 or TRN-3, as I said in my previous report."

Mr. Reineke reviewed the leases and the Settlement Agreement and the Enhancement Clause. (Doc. Id. 181-5, Reineke Report, September 25, 2020, pp. 2-3.) He described the manner Antero pays lessors for the gas and NGLs. Id. p. 3. For the leases which are subject to the Settlement Agreement and the Enhancement Clause, he testified that Antero is not entitled to take any deductions from the royalty for the natural gas and the NGLs. Id. at pp. 8, 10. "Antero did not have the right to take the deductions" and referred to his first report dated February 10, 2020. (Doc. Id. 181-4).

The phrase "work back method" is emphasized by defendant throughout as if it has an important legal meaning. That phrase is merely a way to describe an accounting methodology for applying or calculating costs and expenses incurred. In the Young case, it was a way to calculate deductions. The *Young* case, *supra*, did not overrule *Tawney*.[6] Further, the lease in *Young* was a very detailed lease that specified numerous, well-stated and described types of deductions, and the Court found that the lease allowed the deductions as set forth in the lease. The Court found that defendant Equinor's, the lessee's, "method" of computing deductions complied with *Tawney* and *Wellman*,[7] but that was the extent of the actual ruling in this case. The *Young* Court referred to two cases which had dealt with the reasonableness of deductions and methods, the *Kay Co., LLC v. EQT Production Co.*, 2018 WL 818498 case and *W.W. McDonald Land Co., v. EQT Production Co.*, 983 F.Supp.21d 790 (S.D.W.Va. 2014.)

---

[6] *Estate of Tawney v. Columbia Natural Res., L.L.C.,* 219 W.Va. 266, 633 S.E.2d 22 (2006).
[7] *Wellman v. Energy Resources, Inc.,* 210 W.Va. 200, 557 S.E.2d 254 (2001).

In *McDonald*, the Court painstakingly went through each deduction and made findings of what was reasonable and what wasn't. *McDonald, supra,* at 805-818. Issues related to "method" is tied to the reasonableness requirement in some respects. The deductions must be reasonable, for example, "meals" were not deemed reasonable. *McDonald*, *supra*, at 816. So, the Court in *Young* referred to the West Virginia Supreme Court's criticisms in the *Leggett v. EQT Production Co.,* 239 W.Va. 264, 800 S.E.2d 850 (2017) (*Leggett* 2) case concerning *Tawney and Wellman*, however, the Court in Leggett actually made clear in its opinion that it was not overruling *Tawney*.

> "As previously indicated, the leases at issue herein are flat-rate leases, the royalty provisions of which have been amended by operation of West Virginia Code § 22-6-8 and the required permitting affidavit outlined therein. **The leases in *Wellman* and *Tawney* and other such leases obviously are unaffected by the statute and therefore this opinion**. Accordingly, we find no inconsistent result where two distinct types of leases."

*Leggett v. EQT Production Co.,* 239 W.Va. 282, 800 S.E.2d 868 (2017) (*Leggett* 2).

**<u>Defendant has injured Plaintiffs.</u>**

Defendant has injured Plaintiffs by wrongfully deducting costs from Plaintiffs' royalties, and Defendant has not exceeded its royalty obligations by paying more royalties than required under the subject leases. First, Defendant has failed to plead a claim against Plaintiffs for any such amounts it claims it has overpaid. The Defendant did not plead any counterclaims against Plaintiffs.

Second, even if they had pled a claim against Plaintiffs for such claimed "over-refunds" arose out of the Parties' Settlement Agreement and Release, (See **Exhibit 2**, 3/20/2019 correspondence from Hank Lawrence), pursuant to this Court's reasoning and previous Order in this case (ECF No. 75, *SEALED*), the Defendant "agreed to an unambiguous, general release of any and all potential claims" it "had or may have" relating to the claims that arose before the agreement was signed in August 2015. ECF 75, at 16. "The Settlement Agreement and Release

specifically contemplates the calculation and payment of royalties, including deductions. In Paragraph 14 of the SA, Antero agreed to treat certain lease provisions as providing for gross royalties 'without regard to any postproduction or market enhancement costs claimed or incurred by Antero' (Dkt. No. 50 at 5). Likewise, Antero agreed in Paragraph 17 to provide Settling Plaintiffs an accounting of 'all royalties due and owing on the properties identified in the MLP,' and to pay them any royalties that may have accrued prior to the execution of the SA. (Dkt. No. 50 at 6)." ECF 75, at 16-17. Thus, if the plain language of the Settlement Agreement and Release released all claims which arose prior to the execution of the SA and Plaintiffs were prohibited from claiming any wrongful deductions that were taken prior to the execution of the SA, the same reasoning applies to Defendant, and Defendant cannot now claim "over-refunds" based upon that Settlement Agreement.

Nonetheless, and alternatively, Plaintiffs do not agree that the Defendant have no general duty to pay for unsold gas volumes. While the district court in *W.W. McDonald Land Co. v. EQT Production Co.*, 983 F. Supp.2d 790, 802-03 (S.D.W.Va. 2014) held that lessees are not obligated to pay lessors based upon the volume of gas produced as opposed to the smaller volume that is sold at the interstate pipeline connection, such holding is based, at least in part, upon an erroneous concession made by counsel that the holdings in *Tawney* only applied to monetary costs and not volume losses. That concession is not made here.[8]

---

[8] Plaintiffs note that the lower court and jury in *Tawney* awarded the plaintiffs damages for improper volume-loss deductions. The issue was also raised in the defendant's petition for appeal. The West Virginia Supreme Court refused the Petition for Appeal. *See* Article 8, Section 4, West Virginia Constitution ("A writ of error, supersedeas or appeal shall be allowed by the supreme court of appeals, or a justice thereof, only upon a petition assigning error in the judgment or proceedings of a court and then only after the court, or a justice thereof, shall have examined and considered the record and is satisfied that there probably is error in the record, or that it presents a point proper for the consideration of the court." Had the Court believed that the lower court and jury had probably committed error by granting Plaintiffs damages for such deductions of volume loss, the Court would have granted the petition for appeal.

13

In *Tawney*, the Court explained, in relevant part:

Plaintiffs below are the owners of oil and gas ("lessors") which have been leased to Defendant Columbia Natural Resources or a predecessor in interest ("CNR"). At least since 1993, CNR has taken deductions from Plaintiffs' 1/8 royalty for "post-production" costs. These costs include CNR's delivery of gas from the well to the Columbia Gas Transmission ("TCO") point of delivery, CNR's processing of the gas to make it satisfactory for delivery into TCO's transportation line, and **losses of volume of gas due to leaks in the gathering system or other volume loss** from the well to the TCO line.

The post-production deductions taken by CNR include **both monetary and volume deductions**.

*Estate of Tawney v. Columbia Natural Resources, LLC*, 219 W.Va. at 269, 633 S.E.2d at 25.

*Tawney*'s holdings were not limited to monetary costs as opposed to volume losses. For instance, Syllabus Point 1 of *Tawney, supra,* provides: "If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear **all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale**." Syllabus Point 4, *Wellman v. Energy Resources, Inc.,* 210 W.Va. 200, 557 S.E.2d 254 (2001)." *See also, Tawney,* Syl. Pts. 2, 10 & 11.

Plaintiffs submit that the implied covenant to market essentially places the risk of loss, including volume loss, on lessees unless expressly stated otherwise in the leases. Defendants, as lessees, could have allocated this risk of loss by requiring Plaintiffs, as lessors, to share in the risk had the Defendants expressly and unambiguously provided in the leases that they were entitled to take deductions for volume loss. The Defendant has failed to do so under the leases at issue herein, and, accordingly, Defendant had an obligation to pay Plaintiffs for volumes of gas based on wellhead volumes, and is not entitled to an offset from Plaintiffs royalties.[9]

---

[9] Furthermore, regarding flat rate leases, West Virginia Code § 22-6-8 (2018) requires royalty payments to be on all volumes of oil or gas extracted. "[I]t is the policy of this state to the extent possible, to prevent the extraction, production or marketing of oil or gas under a lease or leases or other continuing contract or contracts providing a flat well royalty or any similar provisions for compensation to the owner of the oil and gas in place, **which is not inherently related to the volume of the oil or gas produced or marketed**." W.Va. Code § 22-6-8(b) (emphasis added). Section 22-6-8(e) further provides that an applicant **"shall tender to the owner of the oil or gas in place not**

                                                **GERALD CORDER,** *et vir***.**

                                                By Counsel

/s/ Marvin W. Masters
West Virginia State Bar No. 2359
April D. Ferrebee
West Virginia State Bar No. 8034
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301
Counsel for Plaintiffs
F:\5\1025\b061.docx

---

**less than one eighth of the gross proceeds, free from any deductions for post-production expenses, received at the first point of sale to an unaffiliated third-party purchaser in an arm's length transaction for the oil or gas so extracted, produced or marketed** before deducting the amount to be paid to or set aside for the owner of the oil or gas in place, **on all such oil or gas to be extracted, produced or marketed from the well**." (emphases added).

15

**CERTIFICATE OF SERVICE**

I, Marvin W. Masters, hereby certify that on February 25, 2021, I electronically filed "Plaintiffs' Reply to Antero Resources Corporation's Response to Plaintiffs' Motion for Summary Judgment" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

>W. Henry Lawrence
>West Virginia State Bar No. 2156
>Amy M. Smith
>West Virginia State Bar No. 6454
>Shaina D. Massie
>West Virginia State Bar No. 13018
>Steptoe & Johnson PLLC
>400 White Oaks Boulevard
>Bridgeport, West Virginia  26330
>hank.lawrence@steptoe-johnson.com
>amy.smith@steptoe-johnson.com
>shaina.massie@steptoe-johnson.com
>*Counsel for Defendants*

/s/ *Marvin W. Masters*
West Virginia State Bar No. 2359