**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**GERALD W. CORDER,**

     **Plaintiff,**

**v.**

**ANTERO RESOURCES CORPORATION,**
**a Delaware corporation,**

     **Defendant.**

**Civil Action No. 1:18-CV-30**
**Hon. Judge Irene M. Keeley**

c/w 1:18CV31, 1:18CV32,
1:18CV33, 1:18CV34, 1:18CV35,
1:18CV36, 1:18CV37, 1:18CV38,
1:18CV39, 1:18CV40 for purposes of
discovery and setting schedule

**MEMORANDUM IN SUPPORT OF ANTERO RESOURCES**
**CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Defendant Antero Resources Corporation ("Antero") submits this memorandum in support of its motion for summary judgment in these consolidated actions.  Antero is entitled to summary judgment on Plaintiffs' remaining claims for breach of contract regarding several leases in which Plaintiffs allege interests. Antero has not breached Plaintiffs' leases as a matter of law because the various leases each authorize Antero to take deductions using the "work-back" method applied by the Fourth Circuit in *Young v. Equinor USA Onshore Properties, Inc.*, 982 F.3d 201, 208–09 (4th Cir. 2020).  Moreover, there are marked differences between the costs of marketing and transportation at issue in *Tawney v. Columbia Natural Resources, LLC*, 219 W. Va. 266, 633 S.E.2d 22 (2006), and the costs to manufacture natural gas liquids ("NGLs") and transport residue gas beyond the local market at issue.  In addition, Plaintiffs have not been injured as a matter of law.  First, Antero has over-refunded Plaintiffs $21,126.40 in costs previously deducted.  Second, Antero pays Plaintiffs royalties on at least the MMBtu value at the wellhead of the gas at its weighted average sales price ("WASP"). If the gas is processed, Antero pays royalties on the value of the NGLs when it is greater.  Therefore, this Court should grant summary judgment to Antero.

## II.    STATEMENT OF THE CASE

Plaintiffs Gerald W. Corder, Marlyn C. Sigmon, Garnet C. Cottrill, Randall N. Corder, Janet C. and Leroy Packard, Lorena Krafft, Cheryl Morris, Tracy Bridge, Angela Nicholson, Kevin McCall, and Brian McCall initiated these actions on December 6, 2017, by filing a single complaint in the Circuit Court of Harrison County, West Virginia.  The complaint was severed and assigned eleven separate civil action numbers.  ECF No. 1-1.[1]  The actions were removed to this Court based on diversity of citizenship. ECF No. 1.

Subsequently, Plaintiffs filed amended complaints.  ECF No. 13. Motions to dismiss the amended complaints were filed.  ECF No. 16.  Plaintiffs filed motions for leave to file second amended complaints. ECF No. 27.  On June 11, 2018, the Court entered its Memorandum Opinion and Order Granting Plaintiffs' Motion to Amend the Complaint, Granting in Part and Denying in Part Defendants' Motion to Dismiss, and Consolidating Cases for Purposes of Ruling on These Motions.[2]  The Court denied Antero's motions to dismiss the breach of contract claims as alleged in Plaintiffs' proposed second amended complaints.  *Id.* at 22.  The Court reasoned that the leases attached as Exhibit 2 to the second amended complaints contain a market enhancement clause that may comply with *Tawney v. Columbia Natural Resources, LLC*, 219 W. Va. 266, 633 S.E.2d 22 (2006), but that the clause also expressly forbids Antero from deducting costs to market oil and gas or place it in marketable form and that any such deductions fall within Plaintiffs' allegations. *Id.* at 20–21.  The Court further reasoned that the leases attached as Exhibits 3–4, 6–7, and 9 to the second amended complaints contain "'market value' provisions [that] do not render the leases

---

[1] Unless otherwise indicated, all ECF references are to the lead case Civil Action No. 1:18cv30.
[2] The Court dismissed Antero Midstream Partners LP, Antero Resources Pipeline LLC, and Antero Resources Investment LLC, which also had been named as Defendants in the second amended complaints.  ECF No. 29 at 8–12. The Court also dismissed Plaintiffs' claims for breach of fiduciary duty, misrepresentation, and punitive damages. ECF No. 29 at 23–34.

unambiguous enough to escape *Tawney*." *Id.* at 22.  Finally, the Court reasoned that the lease attached as Exhibit 8 to the second amended complaints is a flat rate lease that, pursuant to *Leggett v. EQT Production Co.*, 239 W. Va. 264, 800 S.E.2d 850 (2017), authorizes Antero to take reasonable, actual post-production deductions, but that Plaintiffs' allegations that such deductions were not reasonable or actual make it plausible that Antero did not comply with *Leggett*.  *Id.*

Second amended complaints were filed thereafter.  ECF No. 30.  The second amended complaints identify and attach as Exhibits 2 through 9 several oil and gas leases that contain various royalty provisions.  As mentioned above, several leases for a single 48.69-acre tract in Harrison County attached as Exhibit 2 have the following market enhancement clause:

> It is agreed between the Lessor and Lessee that notwithstanding any language herein to the contrary, all oil, gas, or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements.  However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

*See, e.g.*, ECF No. 30-2 at 6, 12, 18, 24, 31, 39.[3]

Two leases, one for a 50.82-acre tract and another for a 54.18-acre tract in Harrison County attached as Exhibits 3 and 4, respectively, have the following market value royalty provision as they relate to gas and NGLs:

> In Consideration of the Premises, the said party of the second part, covenants and agrees: . . .  [S]econd to pay one-eighth (1/8) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm.

---

[3] Documents at ECF No. 30-2 at 42–51 are memoranda of oil and gas lease containing market enhancement clauses.

. . .

> It is agreed by the parties hereto that the Lessee, its successors or assigns, shall have the right to use off the farm for such purposes as it may desire "Casing Head Gas," (being gas produced from wells on the premises), but if said "casing head gas" or any part thereof should be manufactured into gasoline or other by-products by said company, said Lessors shall receive one-eighth of the net value at the factory of the gasoline and other by-products so manufactured.

ECF No. 30-3 at 1; ECF No. 30-4 at 1.

A lease for two separate tracts, one being 104 3/4 acres and another being 6 1/2 acres in Harrison County attached as Exhibit 5 has the following price received royalty provision as it relates to natural gas:

> (b)    Lessee shall pay a royalty for all gas produced, saved, and marketed from the Leased Premises equal to one-eighth (1/8th) of the price received by the Lessee from the sale of such gas.  Said payments shall be paid to Lessors monthly for all natural gas for which Lessee receives payment during the preceding calendar quarter.

ECF No. 30-5 at 4–5.[4]

Two leases, one for a 59-acre tract and another for a 105-acre tract in Harrison County attached as Exhibits 6 and 7, respectively, have the following market value royalty provision as they relate to native gas:

> (b)    Lessee covenants and agrees to pay Lessor as a royalty for the native gas from each and every well drilled on said premises producing native gas, an amount equal to one-eighth (1/8) of the gross proceeds received from the sale of same at the prevailing price for gas sold at the well, for all native gas saved and marketed from the said premises, payable quarterly.

ECF No. 30-6 at 1; ECF No. 30-7 at 1.

A lease for a 50-acre tract in Harrison County attached as Exhibit 8 has the following flat rate royalty provision:

> Second party agrees to deliver in pipe lines to the credit of first party free of cost, the equal one eight part of all oil produced on these premises, and to pay $100–

---

[4] This royalty provision was not discussed in Antero's motion to dismiss.

dollars per year for each and every gas well obtained on these premises, provided gas is marked off [sic], payable sixty days from date same is utilized.

ECF No. 30-8 at 2.[5]

A lease for a 50-acre tract in Doddridge County attached as Exhibit 9 has the following market value royalty provision as it relates to gas and NGLs:

In consideration of the premises, the said party of the second part covenants and agrees: . . . [S]econd, to pay monthly Lessors' proportionate share of the one-eighth (1/8th) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm, and to pay monthly Lessors' proportionate share of the one-eighth (1/8th) of the net value at the factory of the gasoline and other gasoline products manufactured from casinghead gas.

ECF No. 30-9 at 1.[6]

Antero filed its answer to the second amended complaints. ECF No. 39. Thereafter, Antero filed a motion for judgment on the pleadings. ECF No. 44. Antero argued, among other things, that the claims of Plaintiffs Gerald W. Corder, Randall N. Corder, Lorena Krafft, Cheryl Morris, Tracy Bridge, Angela Nicholson, Kevin McCall, and Brian McCall (the "Settling Plaintiffs") are barred by the doctrines of payment and release based on a Settlement Agreement entered into in August 2015. *Id.* On March 25, 2019, the Court entered its Memorandum Opinion and Order Granting in Part and Denying in Part Defendant's Motion for Judgment on the Pleadings. ECF No. 75. The Court dismissed with prejudice the Settling Plaintiffs' breach of contract claims on the leases attached to the second amended complaints as Exhibits 2–8 that arose before the Settlement Agreement was signed. *Id.* at 17, 19.

Discovery is completed in these actions, and trial is scheduled to begin on June 7, 2021. ECF No. 159.

---

[5] Randall Corder's interest in this tract was sold by tax sale deed dated January 29, 2002, and recorded in the Office of the Clerk of the County Commission of Harrison County at Book 1337, Page 696. ECF No. 39-1.

[6] Janet and Leroy Packard's interest in this tract was sold by tax sale deed dated October 29, 2009, and recorded in the Office of the Clerk of the County Commission of Doddridge County at Book 282, Page 517. ECF No. 39-2.

III. <u>**DISCUSSION**</u>

A. <u>**Standard of Decision and Controlling Law.**</u>

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A). The Court must view the evidence "in the light most favorable to the nonmoving party." *Providence Square Assocs., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining the truth and determine only whether genuine issues of triable fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and establishing the nonexistence of genuine issues of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. *Id.* at 248–52.

Because this case invokes the Court's diversity jurisdiction, the Court's role is to apply controlling state law, or, if necessary, predict how the West Virginia Supreme Court of Appeals would rule on an unsettled issue. *McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 279 (4th Cir. 2016). The Court should apply the relevant principles of state law as it believes they would be applied by the West Virginia Supreme Court of Appeals in this context.  *Id.*

## B.   Antero Is Entitled to Summary Judgment on Plaintiffs' Claims.

Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract.  In *Richards v. EQT Production Co.*, No. 1:17cv50, 2018 WL 3321441 (N.D. W. Va. July 5, 2018), this Court held that, in order to prevail on a motion for summary judgment on a breach of contract claim under West Virginia law, a plaintiff must establish the following four elements: (1) the existence of a valid, enforceable contract; (2) that the plaintiff has performed under the contract; (3) that the defendant has breached or violated its duties or obligations under the contract; and (4) that the plaintiff has been injured as a result. *Id.* at *3.  On the other hand, in order to prevail on a motion for summary judgment on a breach of contract claim, a defendant need only establish the inverse of at least one of the four elements. *Id.* at *3.  Plaintiffs cannot prove the third or fourth elements of their breach of contract claims because Antero has not breached Plaintiffs' leases, and Plaintiffs have not been injured as a matter of law.

In *K & D Holdings, LLC v. Equitrans, L.P.*, 812 F.3d 333 (4th Cir. 2016), the Fourth Circuit construed an oil and gas lease, observing that "West Virginia contract law principles apply equally to the interpretation of leases." *Id.* at 339 (citing *Energy Dev. Corp. v. Moss*, 214 W. Va. 577, 591 S.E.2d 135, 143 (2003)). The court rejected the plaintiff's argument that oil and gas leases should be liberally construed in favor of the lessor, holding that the general rule does not apply unless there is an ambiguity as to the meaning of the lease terms.  The court concluded that the language of the lease at issue in that case was clear and not subject to the rule of construction advocated by the plaintiff. The court further found the plaintiff's arguments based on fairness and West Virginia public policy unavailing in interpreting the unambiguous lease. *Id.* at 339–40 & n.7. As discussed below, Antero has complied with and not breached the unambiguous terms of Plaintiffs' leases.

1.       **Antero has not breached Plaintiffs' leases.**

   a.       **Antero has not breached the market enhancement leases.**

Antero has not breached the market enhancement clause in the leases attached to the second amended complaint as Exhibit 2. The Court's interlocutory ruling that Antero's market enhancement clause may comply with *Tawney v. Columbia Natural Resources, LLC*, 219 W. Va. 266, 633 S.E.2d 22 (2006), *see* ECF No. 29 at 20–21, is consistent with the Fourth Circuit's decision in *Young v. Equinor USA Onshore Properties, Inc.*, 982 F.3d 201, 208–09 (4th Cir. 2020). Following discovery, however, there is no evidence to support any allegations that Antero's deductions are not for actual and reasonable post-production costs approved in *Young*.

In *Young*, the Fourth Circuit vacated the Court's grant of summary judgment for the plaintiffs and remanded the case for entry of summary judgment for the defendants, holding that an oil and gas lease unambiguously allowed the defendants to deduct costs from royalties using the "work-back" method adopted by the West Virginia Supreme Court of Appeals in *Leggett v. EQT Production Co.*, 239 W. Va. 264, 800 S.E.2d 850 (2017).  The royalty provision in *Young* granted the lessors a royalty share that was a percentage of the net amount realized by the lessees computed at the wellhead, stated that post-production costs incurred by the lessee between the wellhead and point of sale would be deducted from the gross proceeds to calculate the net amount realized at the wellhead, specified seven types of such post-production costs between the wellhead and point of sale that would be deducted, and allowed the lessees to either contract with others or to perform post-production operations themselves. *Id.* at 203–04.  In holding that the royalty provision unambiguously allowed deductions, the court rejected the plaintiffs' argument that the lease failed to satisfy West Virginia's requirements for allocating post-production costs to the

lessors under *Tawney v. Columbia Natural Resources, LLC*, 219 W. Va. 266, 633 S.E.2d 22 (2006). *See Young*, 982 F.3d at 205.

*Young* began its analysis with a discussion of *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), in which the court explained "West Virginia's high court held that where 'an oil and gas lease provides *for a royalty based on proceeds received by the lessee*, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale.'" *Young*, 982 F.3d at 206 (quoting *Wellman*, 557 S.E.2d at 265) (emphasis added).

*Young* next explained how *Tawney* expanded on *Wellman* by establishing a three-pronged test to rebut "the *Wellman* presumption" as follows:

> *Tawney* explained that an oil and gas lease that intends to allocate post-production costs between the lessor and lessee must: (1) "expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale"; (2) "identify with particularity the specific deductions the lessee intends to take from the lessor's royalty"; and (3) "indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." 633 S.E.2d at 30. Applying this test, *Tawney held that lease language that provides for the lessor's royalty to be calculated "at the wellhead" is ambiguous, and therefore fails to rebut the Wellman presumption under the first prong*.

*Young*, 982 F.3d at 206 (emphasis added).

*Young* continued with analysis of *Leggett* and recognized *Leggett*'s conclusion that *Wellman* and *Tawney* did not inform the interpretation of West Virginia's flat-rate royalty statute, W. Va. Code § 22-6-8, and that the statute permitted the deduction of post-production costs using the work-back method. *Young*, 982 F.3d at 206. The court in *Young* found the criticism of *Wellman*'s and *Tawney*'s "faulty legs" in *Leggett* compelling, reasoning as follows:

> The [*Leggett*] court recited an array of "stinging" criticism from scholars complaining that *Wellman* and *Tawney* rest on an "unwillingness to accept the realities of deregulation in the natural gas market." *Id.* at 863. From 1938 until the "deregulation" that occurred in 1993, buyers "purchased gas at or near the wellhead, thereby absorbing most post-wellhead [i.e., post-production] costs." *Id.*

at 857 n.10. Today, however, "most gas is purchased away from the wellhead," giving rise to vastly greater post-production costs incurred by the seller. *Id.* Given this new reality, the court hinted (without formally holding) that *Wellman* and *Tawney* are "nothing more than a re-writing of the parties' contract to take money from the lessee and give it to the lessor." *Id.* at 863.

*Leggett did, however, expressly reject Tawney's assertion that the phrase "at the wellhead" is facially ambiguous. Instead, it interpreted the statutory phrase to require the calculation of royalties based on "the value of the gas at the well, before it is transported, treated, compressed or otherwise prepared for market." Id. at 864–65. The court determined that "the most logical way to ascertain the wellhead price" under section 22-6-8 is "to deduct the post-production costs from the 'value-added' downstream price." Id. at 866. This "'work-back' method of royalty calculation" prevents lessors from "unfairly maximiz[ing] their royalty payments without commensurately bearing the costs of achieving that maximum value." Id. at 867.*

Reading these cases together, we glean the following principles of West Virginia law: *An oil and gas lease must satisfy Tawney's three-pronged test to rebut the Wellman presumption that the lessee will bear all post-production costs. And although Leggett didn't overrule Wellman and Tawney, its criticism of those cases and its endorsement of the work-back method inform our analysis here.*

*Young*, 982 F.3d at 207 (second and third alterations in original) (emphasis added) (footnote omitted).

Significantly, *Young* rejected the plaintiffs' argument challenging the reasonableness of deductions, observing that "'"[r]easonableness" is a common legal standard that has been used by courts for more than a century' and simply limits any deductions to those that are rationally related to the specified categories of post-production costs." *Id.* at 208 (citing *W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 808 (S.D. W. Va. 2014)).  The Fourth Circuit concluded:

In sum, we are satisfied that the lease suffices under *Tawney* to indicate the method for calculating the amount of post-production costs to be deducted when calculating the Young's royalties.  That method is simply to add up all of the identified, reasonable, and actually incurred post-production costs, and deduct them from [the defendants'] gross proceeds.  The amount is then adjusted for the Young's fractional share of the total pooled acreage and their royalty rate.  Especially in light of *Leggett*, West Virginia law demands no more.

*Id.* at 209.

In this action, the leases attached to the second amended complaint as Exhibit 2 have the following market enhancement clause:

> It is agreed between the Lessor and Lessee that notwithstanding any language herein to the contrary, all oil, gas, or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements.  However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

*See, e.g.*, ECF No. 30-2 at 6, 12, 18, 24, 31, 39.

Similar to *Young*, the market enhancement clause unambiguously provides that Plaintiffs will bear post-production costs and identifies the post-production costs with particularity.  In addition, the market enhancement clause indicates the method for calculating the amount of post-production costs to be deducted when calculating royalties.  That method is simply to add the identified, reasonable, and actually incurred post-production costs once the product is in marketable form and deduct them from Antero's gross proceeds to get the amount realized.  The amount realized is then adjusted for Plaintiffs' fractional share of the total pooled acreage and their royalty rates as reflected in the leases.  Specifically, the market enhancement leases provide: "The royalties provided for [herein] shall be tendered or paid to Lessor in the proportion that Lessor's acreage in the pooled area(s) bears to the total pooled area."  ECF No. 30-2 at 3.  Moreover, Antero pays royalties on the market enhancement clauses at the stated percentage royalty rate.  *Id.* at 6.  Accordingly, the market enhancement clauses unambiguously allow Antero to deduct costs from royalties using the "work-back" method adopted in *Leggett*.

In addition, the evidence is undisputed that Antero has taken only allowable deductions that enhance the value of marketable products and that all such deductions have been for actual

and reasonable costs. Antero produced its gathering and compression, processing, and transportation agreements and amendments in discovery. *See* Schopp Decl. at 1–2 & Ex. 1 (discussing Antero's discovery production and providing a summary overview pursuant to Federal Rule of Evidence 1006).[7]   Antero also produced statements and invoices for gathering and compression, processing, and transportation for sample months. *See id.* at 2 & Ex. 2.

Specifically, Plaintiffs have been charged deductions for COM3, PRC2, and TRN3 for their market enhancement leases.[8]  COM3 represents costs for compression associated with compressors at the Sherwood Processing Plant. *See* 12/18/20 Schopp Dep. Tr. 130:16–22.[9]  PRC2 represents costs associated with the manufacture of NGLs. *See* 1/23/20 Schopp Dep. Tr. 20:12–24:1 (discussing how PRC2 generally is comprised of fees and charges for processing, fractionation, and NGL transportation).[10]  TRN3 represents costs for transportation of residue gas to a more profitable market. *See id.* at 85:1–87:19, 147:24–148:16.

Antero explained how such charges enhance the value of marketable products in its verified response to Plaintiffs' second set of interrogatories as follows:

> Antero computes royalties on the greater of (i) the revenues Antero received from the sale of NGLs attributable to each of Plaintiffs' well(s), less a proportionate share of processing and fractionation-related costs (the "Net Factory Value"), and (ii) the "Shrink Value" of the NGLs, being the value of the MMBtu content of the natural gas converted in the processing and fractionation processes used to produce the NGLs at the weighted average sales price ("WASP") Antero receives for its sale of residue gas.  Where the Net Factory Value exceeds the Shrink Value, Antero pays the royalties on the sale of NGLs attributable to Plaintiffs' well(s) (denoted on the remittance statement as "PPROD") with a deduction for the proportionate share of processing and fractionation costs (denoted on the remittance statement as "PRC2").  In such a case, the Shrink Value is not included in the computation of Plaintiffs' royalties on natural gas.  Conversely, where the Shrink Value exceeds

---

[7] The Declaration of Alvyn A. Schopp and exhibits thereto are collectively attached as "Exhibit A."

[8] Settling Plaintiffs have not been charged COM3 following the August 2015 Settlement.  *See* Schopp Decl. at 3 & Ex. 3 (discussing Antero's production of Plaintiffs' royalty payment data and providing a summary pursuant to Federal Rule of Evidence 1006).  These Plaintiffs have therefore released any claims regarding COM3.

[9] A copy of the transcript of the December 18, 2020 deposition of Alvyn A. Schopp is attached as "Exhibit B."

[10] A copy of the transcript of the January 23, 2020 deposition of Alvyn A. Schopp is attached as "Exhibit C."

the Net Factory Value, Antero pays the royalties on the Shrink Value, such that Plaintiffs will receive royalties on natural gas as if it had not been processed or fractionated, and without deduction for processing and fractionation-related costs. Where Antero incurs costs to transport gas to a point of sale resulting in a price equal to or more favorable than the available pool price, Antero pays the royalty on Plaintiffs' natural gas with a deduction for Plaintiffs' proportionate share of the additional transportation charge (denoted on the remittance statement as "TRN3") from the available pool to the location of sale. Such deduction is limited to the transportation charge or the portion of the transportation charge resulting in a more favorable price. This calculation analyzes whether the Marcellus firm transportation agreements add economic value to owners and should be considered TRN3. If the realized price less TRN3 charge exceeds or equals the alternative sales index, firm transportation charges will be allocated through the revenue process as TRN3. If however, the realized price less TRN3 charge is less than the alternative sales index, firm transportation charges will only be distributed to owners as TRN3 up to such added economic benefit to owners.

*See* Antero's Resp. Interrog. No. 2.[11]

Antero's expert, Kris L. Terry, opined that "Antero's practice of paying royalties on the greater of (i) the full wellhead MMBTU multiplied by the WASP; or (ii) the net factory value of the NGLs, plus the residue gas value . . . exceeds industry standards," and that "Antero's practice of charging transportation costs for Out-of-Basin sales that enhance the value of the In-Basin gas sale on a well by well basis meets or exceeds industry standards." Terry Report at 12, 15.[12] In other words, PRC2 deductions for processed gas have resulted in greater royalties compared to the value of the marketable gas at the wellhead.[13] Likewise, TRN3 deductions for residue gas have resulted in greater royalties compared to local index sales prices. Plaintiffs' expert Daniel T. Reineke has not opined that any deductions were not actual or reasonable.[14] For these reasons, Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract regarding the market enhancement leases.

---

[11] A copy of Antero's verified response to Plaintiffs' second set of interrogatories is attached as "Exhibit D."

[12] A complete copy of the Declaration and Expert Report of Kris L. Terry is attached as "Exhibit E."

[13] Plaintiffs' gas no longer goes through the Sherwood Processing Plant, and NGLs are no longer manufactured from their gas. Antero no longer charges Plaintiffs deductions for PRC2. *See* Antero's Supp. Resp. Interrog. No. 2. A copy of Antero's supplemental verified response to Plaintiffs' second set of interrogatories is attached as "Exhibit F."

[14] A copy of the Expert Report of Daniel T. Reineke dated February 10, 2020, is attached as "Exhibit G."

**b.**     <u>**Antero has not breached the market value leases.**</u>

In addition, Antero has not breached the market value leases attached as Exhibits 3, 4, 6, 7, and 9[15] to the second amended complaint. The Court's interlocutory ruling that the market value provisions do not render the leases unambiguous enough to escape *Tawney*, *see* ECF No. 29 at 22, is inconsistent with the Fourth Circuit's recent decision in *Young* and its prior decision in *Imperial Colliery Co. v. Oxy USA Inc.*, 912 F.2d 696 (4th Cir. 1990).  As discussed above, *Young* recognized that the holding in *Wellman* established a presumption that the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale is limited to proceeds leases. *See Young*, 982 F.3d at 206 (quoting *Wellman*, 557 S.E.2d at 265). *Young* further explained how *Tawney* expanded on *Wellman* by establishing a three-pronged test to rebut "the *Wellman* presumption." *Id.* Finally, *Young* observed that *Leggett* expressly rejected *Tawney*'s assertion that the phrase "at the wellhead" is facially ambiguous.  *Id.* at 207.  As discussed below, Antero's market value leases are not governed by the *Wellman* presumption regarding proceeds leases or the *Tawney* three-pronged test to rebut the *Wellman* presumption but rather authorize use of the work-back method to obtain the value or prevailing price for gas "at the wellhead," which *Young* recognized is unambiguous under *Leggett*.

Market value leases were expressly excluded from the discussion in *Wellman* and not addressed in *Tawney*'s decision on certified questions.  *Wellman* states as follows: "Where leases call for the payment of royalties based on the *value* of oil or gas produced, and sold directly, the Court perceives that there are possibly different issues, and they are excluded from this discussion."  *Wellman*, 557 S.E.2d at 264 n.3 (emphasis added). Thus, the West Virginia Supreme

---

[15] Plaintiffs Janet and Leroy Packard have no interest in the lease attached as Exhibit 9 to the second amended complaint.

Court of Appeals recognized the distinctions between proceeds leases and market value leases,[16] excluding market value leases from its holding on the deduction of post-production costs.[17]

Market value leases also were removed from the reformulated certified question and not within the West Virginia Supreme Court of Appeals' holding in *Tawney*. The holding in *Tawney*, which adopted the reasoning in *Wellman*, also was limited to proceeds leases. *See Tawney*, 633 S.E.2d at Syl. Pt. 1 ("'If an oil and gas lease provides for a royalty based on *proceeds* received by

---

[16] Secondary authorities have recognized that, "[u]nder some leases, royalties are based upon the 'market value' of the product," or "the prevailing market price for gas in the vicinity at the time of the sale, irrespective of the actual sale price." 58 C.J.S. *Mines and Minerals* § 377 (Dec. 2020 Update).  Conversely, "[u]nder some leases, royalties are based upon 'proceeds,' meaning the amount of money received by the lessee upon its sale of the product."  *Id.* (footnotes omitted).  Secondary authorities also have recognized:

> The term "at the well," when used with reference to oil and gas royalty valuation, means that the oil and gas is to be valued in its unprocessed state as it comes to the surface of the mouth of the well. "At the well" refers to gas in its natural state, before the gas has been processed or transported from the well.
>
> . . .
>
> Generally, an oil and gas lease which provides that the lessee shall pay the lessor monthly as royalty on gas marketed from each well one eighth of the proceeds if sold at the well, or, if marketed off the leased premises, then one-eighth of the market value at the well, is clear and unambiguous as to gas sold at the wellhead by the lessee in a good faith sale, and the lessor is entitled to no more than his or her proportionate share of the amount actually received by the lessee for the sale of the gas.

*Id.* (footnotes omitted).

[17] The West Virginia Supreme Court of Appeals recognized *Wellman*'s limited application to proceeds leases in *Cabot Oil & Gas Corp. v. Beaver Coal Co., Ltd.*, No. 16-0904, 2017 WL 5192490 (W. Va. Nov. 9, 2017).  In *Cabot*, the plaintiff argued that a 2004 arbitration award should not have a preclusive effect because, according to the plaintiff, the panel improperly relied on *Wellman*.  *Id.* at *7.  The Court rejected this argument and reasoned:

> While the panel discussed *Wellman*, as well as other cases, it clearly stated that *Wellman* was "expressly limited to 'proceeds' leases, excluded 'value' leases from the discussion and, even as to 'proceeds' leases, failed to resolve the issue of the deductibility of 'post-production' expenses, at least with respect to 'mouth of the well' leases." Because the 1929 Lease is not a proceeds lease, the panel ultimately found there was no "controlling West Virginia decision" and that it was reaching its decision on the deduction of postproduction expenses from royalties by applying "the language of the lease[ ] as written."

*Id.* at *7 n.16.  *See* R. Cordell Pierce, Note, *Making A Statement Without Saying A Word: What Implied Covenants "Say" When the Lease Is "Silent" on Post-Production Costs*, 107 W. Va. L. Rev. 295, 236 (2004) ("The court's holding in *Wellman*, as stated, pertains only to a proceeds lease. In footnote 3, the court stated, '[w]here leases call for the payment of royalties based on the value of oil or gas produced, and sold directly, the Court perceives that there are possibly different issues, and they are excluded from this discussion.'  The court correctly realizes that value or market value leases present different issues and limited the decision to deal only with the proceeds lease.").

the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale.' Syl. Pt. 4, *Wellman v. Energy Res., Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001)." (emphasis added)).

Although *Tawney* rejected the defendant's argument that the "at the wellhead" language unambiguously provided for the deduction of post-production expenses, the Court carefully stated that "we do not believe that *the lease language set forth in the certified question* permits CNR to deduct post-production expenses from the lessors' royalty payments." *Id.*, 633 S.E.2d at 25 (emphasis added). Critically, the Court reformulated the circuit court's certified questions because the questions went beyond the scope of the defendant's summary judgment motion. *Id.*, 633 S.E.2d at 25 n.2. The phrase "wholesale market at the well" was among the language that was dropped from the reformulated certified question that was answered in *Tawney*. *See id.*

The West Virginia Supreme Court of Appeals did not opine on market value leases in answering the reformulated certified question in *Tawney*, but the circuit court did so in deciding post-trial motions. The circuit court adopted the majority view that market value is determined at the time royalties are paid without consideration of contract sales prices or proceeds as follows:

> It is the prevailing law in the United States that gas contracts . . . do not dispense with the lessee/operator's obligations under the royalty clause of the lease to pay royalty for gas when it is produced and delivered for sale, based on the market price of the gas at the time of delivery or the duty to pay based on gas sold at the highest price reasonably obtainable at the time of production, delivery and actual sale of the gas. The seminal case in the United States is *Texas Oil and Gas Corp. v. Vela*, 429 S.W.2d 866 (Tex. 1968). . . . The minority rule holds that "market value" is equivalent to the price assigned in the gas sales contract, *at least as long as that contract was made prudently and in good* faith.

> The prevailing view appears to this court to be the most well reasoned, the most likely position to be adopted by the W. Va. Supreme Court of Appeals and is, therefore, adopted by this court[.]

*Tawney v. Columbia Nat. Res.*, No. 03-C-10E, 2007 WL 5539870, at *29 (W. Va. Cir. Ct. June 27, 2007) (footnote and citations omitted).[18]

The Fourth Circuit, applying West Virginia law, recognized the difference between leases that provide for royalties based on market value or prevailing price and those that provide for royalties based on proceeds in *Imperial Colliery Co*. The Fourth Circuit held that the plain language of an oil and gas lease obligated the defendant to pay royalties on the market value of the gas produced, reasoning as follows:

> In oil and gas practice, there are two generally used lease clauses dictating the amount of royalties due under a lease: the "market value" clause and the "proceeds" clause. Under a market value clause, royalties are paid based upon the market value of the gas; under a proceeds royalty clause, upon the amount of money received by the lessee upon its sales of gas.
>
> The 1944 lease required Oxy to pay Imperial
>
> > One eighth (1/8) of the current *wholesale market value at the well* for all gas produced . . . which *wholesale market value is hereby defined to mean the prevailing purchase price currently paid at the well* by purchasers of gas at wholesale in the field in which the well is located.

*Id.* at 700 (emphasis added).

In arriving at the "prevailing purchase price currently paid at the well," *Imperial Colliery Co.* explained that computation of the value of the gas at the wellhead could be made by deducting compression and gathering expenses from the price paid by the purchaser. *Id.* at 701.[19]

---

[18] In *Texas Oil & Gas v. Vela*, 429 S.W.2d 866 (Tex. 1968), the Texas Supreme Court held that "the contract price for which the gas was sold by the lessee is not necessarily the market price within the meaning of the lease." *Id.* at 871. The parties agreed "in plain terms that the lessee would pay one-eighth of the market price at the well of all gas sold or used off the premises." *Id.* The court held that this "*clearly means the prevailing market price at the time of the sale or use.*" *Id.* (emphasis added). *See* Scott Landsown, *The Implied Marketing Covenant in Oil and Gas Leases: The Producer's Perspective*, 31 St. Mary's L.J. 297, 313 (2000) (listing West Virginia with states that follow *Vela*).

[19] In that case, however, because the contract price was below market value, the court ultimately held that the district court properly applied a "willing buyer-willing seller" analysis, which computes market value by ascertaining the price that a willing buyer would pay a willing seller in a free market without regard to federal gas-price regulations. *Id.* (citing 3 E. Kuntz, *Treatise on the Law of Oil & Gas* § 40.4(d), at 329 (1989)).

In any event, as discussed above, *Young* recently recognized that *Leggett* rejected *Tawney*'s assertion that the phrase "at the wellhead" is ambiguous.  *Young*, 982 F.3d at 207.  *Leggett* went to great lengths to signal the demise of *Wellman* and *Tawney* and their iteration of the marketable product rule, citing with approval authorities criticizing any extension of the first marketable product doctrine in *Wellman* and *Tawney* to the manufacturing of residue gas and NGLs through processing and fractionation of wet gas.  *Leggett*, 800 S.E.2d at 862–63.[20]

---

[20] *Leggett* soundly criticized the holdings in *Wellman* and *Tawney* as follows:

> Commentators have noted that *Wellman* failed to "recognize the variations in the first marketable product doctrine from state to state" and "whether intentionally (as a result of its apparent antagonism against oil and gas producers) or unintentionally (as a result of its cursory review of the case law) . . . adopted yet another version of the first marketable product doctrine[.]" Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What Is the "Product"*?, 37 St. Mary's L.J. 1, 77, 79 (2005). Moreover, *Wellman's*
>
>> "point of sale" approach results in an even bigger windfall for lessors than the "marketable product" approach. Under the "point of sale" approach, a lessor will not only receive a royalty valued upon the gas in its natural state at the wellhead or when the gas becomes marketable, but will receive a royalty valued upon the gas in its processed state at the point of sale after the gas has had value added to it solely at the lessee's expense.
>
> Wheeler, *supra* at 27–28.  The *Wellman* and *Tawney* Courts' refusal to align with other states which have more fully developed this rule has, according to these commentators, created "chaos" and "foster[s] the belief—perhaps the reality—that the [marketable product] doctrine lacks any cornerstone principles[.]" Keeling & Gillespie, *supra* at 79, 80.
>
> More importantly, still other commentators have observed that "West Virginia has actually achieved a Marketable Product Rule result that seems to arise more from an unwillingness to accept the realities of deregulation in the natural gas market than from implied covenant law." John W. Broomes, *Waste Not, Want Not: The Marketable Product Rule Violates Public Policy Against Waste of Natural Gas Resources*, 63 U. Kan. L. Rev. 149, 170–71 (2014). As support for this proposition, authors have cited to *Wellman's* and *Tawney's* dogged devotion to Professor Donley's, pre-deregulation 1951 treatise "The Law of Coal, Oil and Gas in West Virginia and Virginia." . . .
>
> In sum, this Court's jurisprudence on this issue has been critically described as follows:
>
>> If one believes the language has a role to play in defining the lessee's rights and obligations under the oil and gas lease, then the artful approach [ ] of the . . . West Virginia court[ ] [is] nothing more than a re-writing of the parties' contract to take money from the lessee and give it to the lessor.
>
> *Id*. at 374. . . .

*Id*.

18

Consistent with *Leggett*'s criticism, in *Cather v. EQT Production Co.*, No. 1:17cv208, 2019 WL 3806629 (N.D. W. Va. Aug. 13, 2019), this Court cited with approval a synthesized reading of *Wellman* and *Tawney* that concluded that "lessees have a duty to bear all costs incurred until the gas reaches *market, not to a point of sale*." *Id.* at *3 (emphasis added) (citing *W.W. McDonald Land Co.*, 983 F. Supp. 2d at 800). In *W.W. McDonald Land Co.*, the court held that the market was the first place downstream of the well where the gas can be sold to any willing buyer and title passed to that buyer.  *Id.* at 803. *But cf. Richards*, 2018 WL 3321441, at *5 n.1 (distinguishing and declining to apply *Tawney* to wellhead sales because "[t]he holding in *Tawney* presumes a sale of gas downstream from the wellhead").

In this action, leases attached as Exhibits 3 and 4 have the following royalty provision as they relate to gas and NGLs:

> In Consideration of the Premises, the said party of the second part, covenants and agrees: . . .  [S]econd to pay one-eighth (1/8) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm.
>
> . . .
>
> It is agreed by the parties hereto that the Lessee, its successors or assigns, shall have the right to use off the farm for such purposes as it may desire "Casing Head Gas," (being gas produced from wells on the premises), but if said "casing head gas" or any part thereof should be manufactured into gasoline or other by-products by said company, said Lessors shall receive one-eighth of the net value at the factory of the gasoline and other by-products so manufactured.

ECF No. 30-3 at 1; ECF No. 30-4 at 1.

The leases attached as Exhibits 6 and 7 have the following royalty provision as they relate to native gas:

> (b)      Lessee covenants and agrees to pay Lessor as a royalty for the native gas from each and every well drilled on said premises producing native gas, an amount equal to one-eighth (1/8) of the gross proceeds received from the sale of same at

the prevailing price for gas sold at the well, for all native gas saved and marketed from the said premises, payable quarterly.

ECF No. 30-6 at 1; ECF No. 30-7 at 1.

The lease attached as Exhibit 9 has the following royalty provision as it relates to gas and NGLs:

In consideration of the premises, the said party of the second part covenants and agrees: . . . [S]econd, to pay monthly Lessors' proportionate share of the one-eighth (1/8th) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm, and to pay monthly Lessors' proportionate share of the one-eighth (1/8th) of the net value at the factory of the gasoline and other gasoline products manufactured from casinghead gas.

ECF No. 30-9 at 1.

In this action, the royalty provisions identified in the leases attached to the second amended complaints as Exhibits 3, 4, and 9 state that royalties are to be paid based on one-eighth (1/8th) of the "value" of the gas at the well. Likewise, the royalty provisions identified in in the leases attached to the second amended complaints as Exhibits 6 and 7 state that royalties are to be paid based on one-eighth (1/8th) of the gross proceeds from the sale of gas "at the prevailing price for gas at the well." Although the leases attached to the second amended complaints as Exhibits 6 and 7 contain references to "gross proceeds," that phrase is clearly modified by the phrase "*at the prevailing price for gas sold at the well*," which is nearly verbatim the definition of the term "wholesale market value" in *Imperial Colliery Co. See* 912 F.2d at 700. Thus, Exhibits 3, 4, 6, 7, and 9 are all market value leases. Because these leases would be considered market value leases, they do not fall under the *Wellman* presumption or require satisfaction of the *Tawney* rebuttal of that assumption. Similar to *Imperial Colliery*, the leases with market value royalty provisions unambiguously authorize Antero to use the "work-back" method in order to determine the royalty Plaintiffs should receive for gas.

It is also critical to understand that the market value royalty provisions do not provide for royalties on NGLs based on gross proceeds at the point of sale. In fact, the royalty provisions in Exhibits 3, 4, and 9 expressly permit Antero to deduct costs from the royalties paid to Plaintiffs for other products. Whereas royalties for gas are based on "market value at the well," royalties for products, including NGLs, are based on "net value at the factory" under such leases. Although the royalty provisions refer to casinghead gas, in *Richards*, 2018 WL 3321441, at *6, this Court held that a similar reference to casinghead gas unambiguously applied to NGLs. *Id. See also Anderson Living Tr. v. XTO Energy, Inc.*, No. 13-CV-941-SWS-KK, 2019 WL 4015210, at *14, 18 (D.N.M. May 15, 2019) (finding that "casinghead gasoline" refers to all NGLs).

Thus, neither "market value" nor "net value" translates under any proper construction of West Virginia law into royalties without deductions, and *Leggett* counsels against such an extension. Likewise, the royalty provision in Exhibits 6 and 7 expressly mentions "native gas." As explained by Antero's expert, "'native gas' in the industry means gas originally in place, which is not the same as residue gas and NGLs, i.e., the separated hydrocarbon components at a plant tailgate." *See* Terry Report at 8 (footnote omitted). Accordingly, Antero is not prohibited from taking deductions, including charges for the manufacture of NGLs (COM3 and PRC2) and transportation to a more profitable market (TRN3), from their market value leases.[21]

Finally, even if *Wellman* and *Tawney* applied to Plaintiffs' market value leases, *Cather* counsels that Antero only would be obligated to bear all costs incurred until Plaintiffs' gas reaches a market rather than the ultimate point of sale. 2019 WL 3806629, at *3. As such, deductions for TRN3 undoubtedly would be permissible. For these reasons, Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract regarding the market value leases.

---

[21] Antero also incurs local transportation charges, which are coded differently. Antero has not taken deductions for local transportation charges from Plaintiffs' royalties in this action although it could do so to get to wellhead value.

c. **Antero has not breached the price received for natural gas lease.**

Antero also has not breached the lease that provides for royalties on the price received for natural gas attached as Exhibit 5 to the second amended complaint. The lease attached as Exhibit 5, which was not discussed in the Court's interlocutory ruling, has the following royalty provision as it relates to natural gas:

> (b) Lessee shall pay a royalty for all gas produced, saved, and marketed from the Leased Premises equal to one-eighth (1/8th) of the price received by the Lessee from the sale of such gas. Said payments shall be paid to Lessors monthly for all natural gas for which Lessee receives payment during the preceding calendar quarter.

ECF No. 30-5 at 4–5.

Although the lease attached as Exhibit 5 to the second amended complaints arguably may be characterized as a gross proceeds lease, as discussed above, *Leggett* cited with approval authorities criticizing any extension of the first marketable product doctrine in *Wellman* and *Tawney* to the manufacturing of residue gas and NGLs through processing and fractionation of wet gas. *See Leggett*, 800 S.E.2d at 862–63. As also discussed above, this Court has construed *Tawney* to require payment of royalties without deduction only to a market – not the ultimate point of sale. *See Cather*, 2019 WL 3806629, at *3.

In any event, Antero has not taken *any* deductions from Exhibit 5 to the second amended complaint. *See* Schopp Decl. at Ex. 3. Rather, Antero has paid gross proceeds on gas. *See* 1/23/20 Schopp Dep. Tr. 162:12 (stating this lease was not charged TRN3); *id.* at 163:4–8 (same). Although the lease refers only to gas and does not provide for NGL royalties, Antero paid gross NGL royalties when the net factory value of NGLs is greater than the shrink value. *See id.* at 162:8–17 (stating this lease would receive gross NGL royalties if net NGL value was higher); *id.* at 163:4–8 (stating this lease was not charged PRC2). Accordingly, Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract regarding the price received for gas lease.

### d.   <u>Antero has not breached the flat rate lease.</u>

Finally, Antero has not breached the flat rate lease attached as Exhibit 8 to the second amended complaint.[22]  In ruling on Antero's motion to dismiss the breach of contract claim as to this flat rate lease, the Court found that pursuant to *Leggett*, Antero is entitled to take reasonable, actual post-production deductions from Plaintiffs' royalties. The Court noted, however, that Plaintiffs alleged in the second amended complaint that "'[Antero] charged [them] with costs and charges which were unreasonably excessive and not actual'" ECF No. 29 at 22 (citing ECF No. 27-1 at 32 (alteration in original). The Court denied the motion to dismiss on this basis. *Id.*

Following discovery, there is no evidence that Antero's deductions on the flat rate lease are not actual and reasonable.  As discussed above, Antero produced its gathering and compression, processing, and transportation agreements and amendments in discovery.  *See* Schopp Decl. at 1–2 & Ex. 1 (discussing Antero's discovery production and providing a summary overview pursuant to Federal Rule of Evidence 1006). In addition, Antero produced statements and invoices for gathering and compression, processing, and transportation for sample months. *See id.* at 2 & Ex. 2.  These documents prove that the deductions charged were actually incurred.

Since entering the Settlement Agreement in August 2015, Antero has charged $0.02 in PRC2 deductions from the Settling Plaintiffs for their interests in the flat rate lease.  *See* Schopp Decl. at 3 & Ex. 3 (discussing Antero's production of Plaintiffs' royalty payment data and providing a summary pursuant to Federal Rule of Evidence 1006). In all, Antero has charged Plaintiffs Sigmon, Cottrill, and Packard a total of $5.08 in deductions in that lease.  *See id.* at Ex. 3. There is no evidence that such charges are unreasonable. For these reasons, Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract regarding the flat rate lease.

---

[22] Plaintiff Randall Corder has no interest in the lease attached as Exhibit 8 to the second amended complaint.

### 2.   <u>Plaintiffs have no injury because Antero exceeded its obligations.</u>

Finally, Plaintiffs have no injury because Antero has exceeded its royalty obligations by paying more royalties than required under each of Plaintiffs' leases attached to the second amended complaint.   Notwithstanding the fact that Antero is permitted to take deductions under the various leases, the undisputed evidence is that Antero has *overpaid* Plaintiffs.   As a threshold matter, Antero has issued over-refunds to Plaintiffs in the collective amount of $21,126.40.   *See* Schopp Decl. at 3 & Ex. 3 (discussing Antero's production of Plaintiffs' royalty payment data and providing a summary pursuant to Federal Rule of Evidence 1006).   Even Plaintiffs' expert admitted that such over-refunds should be accounted for. *See* Reineke Dep. Tr. 36:11–37:8 (discussing over-refunds).[23]

In addition, in *W.W. McDonald Land Co. v. v. EQT Production Co.*, 983 F. Supp. 2d 790, 800 (S.D. W. Va. 2013), the court held in granting the plaintiffs' motion for clarification that lessees have no general duty to pay for unsold gas volumes, including but not limited to fuel gas consumed in compressor stations.   The court reasoned: "Like volumes of gas lost or unaccounted for due to pipeline leaks or metering inaccuracies, gas consumed as fuel to power compressors is not sold or marketed. Lessees are not generally obligated to pay royalties on unsold gas because lessees receive no payment for this gas." *Id.* at 817. *See Anderson Living Tr. v. XTO Energy, Inc.*, No. 13-CV-941-SWS-KK, 2019 WL 4015210, at *11 (D.N.M. May 15, 2019) (holding royalties not owed on fuel gas citing *W.W. McDonald Land Co.* with approval).

Thus, Antero indisputably has exceeded its obligations.   Notably, the unrefuted evidence shows that Plaintiffs' royalties were based upon wellhead volumes.   *See* 1/23/20 Schopp Dep. at 126:14–127:1 (stating that Antero pays royalties on "gross wellhead" volumes and does not factor

---

[23] A copy of the transcript of the deposition of Daniel T. Reineke are attached as "Exhibit H."

fuel loss or unaccounted gas into its calculations).  Under *W.W. McDonald Land Co.*, however, Antero would be entitled to an offset for fuel.  Thus, Antero also has overpaid Plaintiffs by basing their royalties on unsold volumes of gas.

In summary, Antero's upgrade calculations exceed its obligations, and Plaintiffs' claims are subject to setoff because Antero has overpaid on its royalty obligations when it pays royalty owners more than the wellhead MMBtu value of the natural gas.  By virtue of its NGL upgrade, Antero pays royalty owners for the value of natural gas liquids if such payment results in a greater payment to the royalty owner after considering the costs to manufacture natural gas liquids.  *See also* Terry Report at 12–15 (opining that Antero's upgrade calculations meet or exceed industry standards). Although entitled to deduct costs such as gathering, compression, local transportation, fuel, and line loss, Antero does not reduce the royalty by these amounts, thereby resulting in higher payments to royalty owners.  Plaintiffs simply have no injury because Antero has exceeded its obligations under the leases.  For these additional reasons, Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court should grant this motion and enter summary judgment for Defendant Antero Resources Corporation.

*/s/  W. Henry Lawrence*
W. Henry Lawrence (WV Bar #2156)
hank.lawrence@steptoe-johnson.com
Amy M. Smith (WV Bar #6454)
amy.smith@steptoe-johnson.com
Shaina D. Massie (WV Bar #13018)
shaina.massie@steptoe-johnson.com
Steptoe & Johnson PLLC
400 White Oaks Boulevard
Bridgeport, WV  26330
(304) 933-8000

Counsel for Antero Resources Corporation

## **CERTIFICATE OF SERVICE**

Pursuant to the Court's Amended Order entered on March 1, 2021 (ECF No. 197), I hereby certify that on the 2nd day of March 2021, I electronically re-filed the foregoing "Memorandum in Support of Antero Resources Corporation's Motion for Summary Judgment" with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the following CM/ECF participants:

> Marvin W. Masters, Esquire
> April D. Ferrebee, Esquire
> The Masters Law Firm, LC
> 181 Summers Street
> Charleston, WV 25301

> */s/ W. Henry Lawrence*
> W. Henry Lawrence (WV Bar #2156)

11137354